# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOSHUA BRENT GRAY,
*Defendant-Appellant.*

No. 05-4397

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TERRENCE A. ASKEW,
*Defendant-Appellant.*

No. 05-4398

Appeals from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CR-03-182)

Argued: October 24, 2006

Decided: July 2, 2007

Before WILLIAMS, Chief Judge, and WILKINSON and
MICHAEL, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the majority
opinion, in which Chief Judge Williams joined. Judge Michael wrote
a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Jonathan David Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia; Mark Lawrence French, CRISWELL & FRENCH, P.L.L.C., Charleston, West Virginia, for Appellants. Richard Gregory McVey, OFFICE OF THE UNITED STATES ATTORNEY, Huntington, West Virginia, for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, George H. Lancaster, Jr., Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant Joshua Brent Gray. Charles T. Miller, Acting United States Attorney, Huntington, West Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

This case arises out of the arrest of defendants Terrence Askew and Joshua Gray at the Huntington, West Virginia apartment leased by Gray. Defendants were charged with conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (2000) and 21 U.S.C. § 846 (2000), and aiding and abetting possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (2000) and 18 U.S.C. § 2 (2000).

Defendants contend that, because police conducted an unlawful search of Gray's apartment, the district court should have granted their motions to suppress evidence obtained from that search. More specifically, Askew argues that he has standing to contest the physical evidence obtained from Gray's residence. We hold, however, that because the Askew-Gray relationship was at core a business one, Askew had no legitimate expectation of privacy in Gray's apartment and cannot claim the protections of the Fourth Amendment. For his part, Gray argues that the testimony of Terrence Askew, David Cole, and Dora Wallace is the product of an illegal search. Because the testimony of the three witnesses was given voluntarily, however, its causal connection to the violation of Gray's Fourth Amendment rights

is too attenuated to be considered the fruit of an unlawful search. For these reasons, we affirm the judgment of the district court.

I.

On July 3, 2003, three members of the Huntington Federal Drug Task Force went to Joshua Gray's apartment, located at 4511 Rear Altizer Avenue, to conduct a "knock and talk." The officers' visit was prompted by drug trafficking complaints filed by at least one neighbor. The officers knocked on, and Gray opened, the side kitchen door. A few moments later, the officers entered Gray's home.

Upon entering the apartment, the officers saw a tan substance, which they believed to be cocaine base, or crack, on the kitchen table. Detective Hunter looked into the living room and observed two men. One man, later identified as Askew, was standing beside a table. The table contained a set of digital scales, a white substance that looked like cocaine, and a second substance that looked like crack cocaine.

Detective Hunter asked for Askew's name. Askew identified himself as "Rico Green," and started to reach into his pocket. Worried that Askew was reaching for a weapon, Detective Hunter told Askew to place his hands over his head and initiated a pat down search. Askew had $8,000 in cash — rolled up in a plastic baggy — in his front pants pocket. An additional plastic baggie of tan chunks, later identified as cocaine base, was hidden in his shoe. During the search, Askew told Officer Hunter that he had swallowed an eight-ball (about 3.5 ounces) of cocaine base, and the officers called the paramedics.

The officers asked Gray for permission to search the rest of the home. Gray refused. Sergeant Copley then applied for and obtained a search warrant. The warrant was executed that day and the officers recovered an additional .36 grams of cocaine base, drug paraphernalia, a .45 caliber Glock handgun, a magazine, and fifteen rounds of ammunition.

While the officers were waiting outside Gray's home for Sergeant Copley to return with the search warrant, David Cole and Dora Wallace came to the residence to purchase drugs. Cole gave a statement

to the officers on July 3, 2003, and also testified before the grand jury on August 12, 2003, in which he described his previous drug purchases at the Gray residence. Cole told officers that he had been to the Altizer Avenue apartment on various occasions and had seen Gray, Askew, and a third man packaging amounts of cocaine base. Wallace declined to speak with officers at the scene. On February 9, 2004, however, she gave a statement to police concerning her knowledge of defendants' drug activities.

On August 12, 2003, a federal grand jury returned a two-count indictment against defendants. Count One charged that defendants knowingly conspired to distribute cocaine base, or crack, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Count Two charged defendants with knowingly and intentionally possessing with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Defendants filed separate motions to suppress the evidence obtained from Gray's residence. The district court held a suppression hearing, and found that Gray had not voluntarily consented to the initial warrantless search of his residence. Accordingly, the court granted Gray's motion to suppress the physical evidence obtained from the illegal entry.[1] The court, however, denied Askew's suppres-

---

[1]At the January 2004 hearing on the motions to suppress, the government argued that Gray had in fact consented to the initial search. Detective Hunter testified that the officers identified themselves to Gray, told him that they were there to investigate drug trafficking complaints, and asked if they could come in. Gray "stepped to the side . . . walked in front of [the officers] . . . and [they] walked in right behind him." Detective Hunter did not remember seeing any officer touch Gray prior to entering the home.

The defendants remembered events differently. They testified that, when the officers asked to speak with him, Gray stepped out of his home, pulling the door behind him. Gray stated that one of the officers, Corporal Jividen, placed his hand on Gray's chest, and said something like, "Let's speak to you inside." Gray took a step back and the officers followed him into his home. According to Gray, he asked the officers if they had a warrant and Officer Jividen replied, "You're going to try and make this tough on us. If you do, I'll make it tough on you." The officers saw what looked like crack cocaine on the kitchen table, handcuffed Gray, and stated that the crack cocaine was their search warrant.

sion motion for lack of standing, finding that Askew did not have a legitimate expectation of privacy in Gray's residence. The court also denied Gray's motion to exclude the testimony of Terrence Askew, David Cole, and Dora Wallace, explaining that the connection between the testimony of the three witnesses and the illegal search was too attenuated to be fruit of the illegal search.

The defendants then entered into conditional plea agreements with the government. On February 12, 2004, Askew pled guilty to aiding and abetting possession with intent to distribute cocaine base and agreed to provide testimony in exchange for dismissal of the conspiracy to distribute cocaine base charge. On April 9, 2004, Gray pled guilty to conspiracy to distribute cocaine base. In return, the government moved to dismiss the aiding and abetting possession with intent to distribute cocaine base charge. Both defendants reserved the right to seek review of the district court's suppression rulings. Following a joint sentencing hearing, the district court sentenced both defendants to 97-month prison terms. Defendants now appeal.[2]

## II.

Askew contends that the district court erred in denying his motion to suppress evidence on the ground that he lacked Fourth Amendment standing to challenge the search of Gray's residence. We review factual findings underlying a motion to suppress for clear error and legal determinations *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

---

[2]At oral argument, Gray's counsel conceded on behalf of both defendants that defendants' Ex Post Facto Clause sentencing argument, based on *United States v. Booker*, 543 U.S. 220 (2005), had been rejected by this court in *United States v. Davenport*. *See Davenport*, 445 F.3d 366, 370 (4th Cir. 2006) (holding that, because defendant was on notice of the maximum statutory penalty when he committed the crime, retroactive application of *Booker* did not violate the Ex Post Facto Clause).

A.

The Fourth Amendment's guarantee of the people's right "to be secure in their persons, houses, papers, and effects," protects individuals living in a large number of legal arrangements. U.S. Const. amend. IV. Until a valid search warrant has issued, the Amendment safeguards the privacy interests of owners, *Agnello v. United States*, 269 U.S. 20, 33 (1925), boarders, *McDonald v. United States*, 335 U.S. 451, 454-56 (1948), and tenants, *Chapman v. United States*, 365 U.S. 610 (1961), of a home, apartment, or other dwelling place. Cotenants, co-owners, and co-occupants can also avail themselves of the Fourth Amendment's protections. *See Georgia v. Randolph*, 126 S. Ct. 1515, 1526 (2006). And, travelers are entitled to be free from unreasonable government scrutiny in their hotel and motel rooms. *See, e.g.*, *Johnson v. United States*, 333 U.S. 10 (1948).

Moreover, while "[t]he text of the Amendment suggests that its protections extend only to people in 'their' houses" a person "may have a legitimate expectation of privacy in the house of someone else." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998). The Supreme Court has long held that the relatives of home owners who regularly reside at the residence are protected by the Fourth Amendment. *Bumper v. North Carolina*, 391 U.S. 543, 546-48 (1968). And, more recently, the Supreme Court extended the Fourth Amendment's privacy protections to overnight guests. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).

The Fourth Amendment's protection of the home does not turn on whether illegal activity takes place therein. A search cannot "be justified by what it turns up." *Bumper*, 391 U.S. at 548 n.10. To the contrary, the people's right to be free from unreasonable government intrusion "has never been tied to measurement of the quality or quantity of information obtained." *Kyllo v. United States*, 533 U.S. 27, 37 (2001). Indeed, notions of privacy would mean little if they crumpled on the finding of inculpatory evidence.

Although the Fourth Amendment's protections against unreasonable government scrutiny are broad, they are not unlimited. It is axiomatic that "suppression of the product of a Fourth Amendment violation can be successfully urged *only* by those whose rights were

violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171-72 (1969) (emphasis added). The right to be free from an unreasonable search is personal in nature and cannot be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Thus, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded place." *Carter*, 525 U.S. at 88 (quoting *Rakas*, 439 U.S. at 143). A search can therefore be unconstitutional with respect to one person, yet the evidence obtained therefrom admissible against a second person.

Of course, every perpetrator of an unlawful act hopes for privacy in the sense of not getting discovered or caught. But it is not enough that an individual have a subjective expectation of privacy. Rather, the expectation must be one "which the law recognizes as 'legitimate.'" *Rakas*, 439 U.S. at 144 n.12. To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Carter*, 525 U.S. at 88 (quotation omitted); *see also Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996).

B.

The Fourth Amendment's protections do not attach to every visitor. For not every visitor "merely present with the consent of the householder" has a legitimate expectation of privacy. *Carter*, 525 U.S. at 90. It is rather a foundational principle that "not all persons in the company of the property owner have the owner's right to assert the spatial protection." *Id.* at 99 (Kennedy, J., concurring). Indeed, the Supreme Court has repeatedly held that the Fourth Amendment is not so broad as to encompass "anyone legitimately on the premises where a search occurs." *Id.* at 90; *see also Rakas*, 439 U.S. at 147-48. Thus, a temporary visitor to a residence — perhaps the mailman or pizza deliverer — cannot generally claim the Fourth Amendment's protections. *See, e.g.*, *Carter*, 525 U.S. at 90; *Terry v. Martin*, 120 F.3d 661, 664 (7th Cir. 1997).

In *Minnesota v. Carter*, the Supreme Court held that visitors who were "essentially present for a business transaction" had no legitimate expectation of privacy in the apartment of a third party. 525 U.S. at 90; *see also United States v. Rhiger*, 315 F.3d 1283, 1286 (10th Cir. 2003) (interpreting *Carter* to create "a clear distinction between the status of individuals present at a residence for social purposes and those present for business or commercial matters"); *United States v. Gamez-Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) (interpreting *Carter* to hold that "[a]n individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location").

The distinction between social guests and business visitors arises from several considerations. To begin with, the text of the Fourth Amendment speaks to the people's interest in "their" homes. It traces its origins to the ancient maxim: "A man's home is his castle." And, while early English cases protect a defendant in his own dwelling, they do not extend to protect "any person who flies to his house." *Semayne's Case*, (1605) 77 Eng. Rep. 194, 198 (K.B.); *see also Johnson v. Leigh*, (1815) 128 Eng. Rep. 1029, 1030 (C.P.). Rather, at common law "the house of any one [wa]s not a castle or privilege but for himself." *Semayne's Case*, 77 Eng. Rep. at 198.

To say that every business visit, however fleeting, gives the visitor a legitimate expectation of privacy in someone else's home strays far from the text and its commonlaw heritage. For "[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo*, 533 U.S. at 31 (internal quotations omitted). And while expectations of privacy are at their apex in one's home, they diminish considerably in nonresidential property. An industrial complex does not, of course, "share the Fourth Amendment sanctity of the home." *Id.* at 37. Rather, the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *Carter*, 525 U.S. at 90 (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)).

Moreover, the purpose for which one goes abroad can determine whether an expectation of privacy is legitimate. *See, e.g.*, *United States v. Higgins*, 282 F.3d 1261, 1271 (10th Cir. 2002); *Gamez-*

*Orduño*, 235 F.3d at 458. Indeed, those who venture forth to conduct illegal business often do not hold a legitimate expectation of privacy in locations that are not their own. Someone who hides illegal activity in a vacant field or abandoned warehouse, for example, takes his or her chances that law enforcement officials will happen upon incriminating evidence.

The distinction between business and social guests also draws upon the fact that a social host often shares not only his home but also his privacy with his guest. *See Olson*, 495 U.S. at 99. Many social guests entrust their hosts with the safety and security of both their persons and their belongings. An overnight guest, for example, seeks shelter in another's home "precisely because it provides him with privacy, a place where he and his possessions will not be disturbed." *Id.* The same generally cannot be said of business visitors. Often strangers with little or no connection to a residence, business associates may or may not have reasons for mutual trust. To expand the protections afforded by the Fourth Amendment to cover any such caller, does not map onto "the everyday expectations of privacy that we all share." *Id.* at 98.

### III.

The facts of this case suggest that Askew was a business, not a social, guest.[3] There can be no doubt that at the time of his arrest Askew was using Gray's apartment to traffic in drugs.

---

[3]Askew, of course, maintained a legitimate expectation of privacy in his person within Gray's residence. Accordingly, Askew has "standing" to challenge the pat down search of his person. But searches incident to lawful arrest are a longstanding exception to the warrant requirement. *See Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979). The district court properly concluded that given the circumstances (Askew was standing next to a set of digital scales and substances appearing to be crack and cocaine) "the officers had probable cause to believe that Mr. Askew was committing a felony." As a result, the search of Askew's person was incident to lawful arrest, and the evidence obtained from the search is clearly admissible. Likewise, the district court correctly concluded that "all statements made [by Askew] during th[e] pat down search were voluntary," and thus admissible. Indeed, Askew does not challenge the district court's suppression order on these grounds.

A.

At the outset, the evidence adduced at the suppression hearing itself suffices to establish that Askew was selling drugs out of Gray's home. In its order denying Askew's motion to suppress, the district court found the following facts. The task force's investigation began when neighbors complained that certain individuals were running a drug ring out of Gray's residence. When the officers arrived, Askew was standing beside a table and identified himself as Rico Green. The table contained a set of digital scales and what appeared to be both cocaine base and cocaine. And Askew had $8,000 in cash hidden in his front pants pocket.

The suppression hearing revealed further undisputed facts which also support the conclusion that the Gray-Askew relationship was a commercial, rather than social, one. For example, Askew had a plastic baggie containing cocaine base hidden in his shoe. On the day of the search, Askew did not have a key to the apartment; had been there for only a short time; and was only one of several visitors. He was not, the district court found, "planning on spending the night."

At the close of the suppression hearing, the district court concluded based on these facts and circumstances "that Mr. Askew did not have a reasonable expectation of privacy in Mr. Gray's home." The court noted that Askew was not an overnight guest, and had not "demonstrated any equivalent reason for his having a legitimate expectation of privacy in [Gray's] home." As a result, the district court denied Askew's Fourth Amendment claim, explaining that he "lack[ed] standing to challenge the officers' entry into Mr. Gray's home on July 3, 2003 and the search and seizure subsequently conducted pursuant to a warrant authorizing a search of Mr. Gray's home."

In short, the district court had more than enough evidence to support its finding "that Mr. Askew did not have a reasonable expectation of privacy in Mr. Gray's home." Indeed, the dissent acknowledges that Askew used Gray's apartment for "his own business purpose": drug dealing. *See infra* at 40. In seeking to overturn the district court's ruling, however, the dissent dismisses Askew's use of Gray's apartment "for his own business purpose" as a "factor," *see infra* at 40, and closes its eyes to the drugs, cash, weapons, and customers that are the

wherewithal of a flourishing drug business. These facts, however, reveal that the Gray-Askew relationship was a commercial one. We hold that the district court correctly concluded that Askew had no legitimate expectation of privacy in the Altizer Avenue apartment.

B.

While the evidence found by the district court in its suppression order itself suffices to uphold the district court's suppression ruling, nothing prohibits our review of confirmatory facts adduced later in Askew's presentence report and sentencing hearing, so long as information obtained from Gray's parallel proceeding is not used against Askew.

The dissent objects, however, to use of later, confirmatory facts found by the district court at sentencing after full due process protections were accorded to the defendant — facts which only serve to confirm what was, in any event, the district court's evidently sound and correct suppression ruling. The idea that district or appellate courts should somehow close their eyes to facts that only bear out the correctness of a district court's initial view is at odds with both common sense and the aims of the criminal justice system. While the dissent may be fearful that these subsequent facts serve to underscore the correctness of the suppression ruling, it is utterly unremarkable that a court should take note of facts developed after a defendant had every opportunity to object to them.[4]

---

[4]The dissent tries to argue that this ruling is "far- reaching" and "unprecedented." *See infra* at 26-27. That is incorrect. In fact, the dissent does not contend that any of the facts from the sentencing hearing were anything other than accurate, anything other than confirmatory of the district court's suppression decision, or anything other than relevant to the nature of Askew's presence in Gray's residence. How this can somehow be of much significance is beyond us unless the judicial process is prepared to renounce its character and close its eyes to evidence. The only unprecedented development would be an artificial ruling precluding the use of concededly accurate facts in all suppression rulings. In fact, the dissent must resort to hypotheticals to voice its concerns, *see infra* at 33, and it goes without saying that the dissent's hypothetical is just that. As for reaching out to make a ruling on the point, the dissent is in no position to take issue, believing as it does that the facts developed in the suppression hearing were insufficient to affirm the district court. While that is not our own view, the dissent should hardly complain about facts that serve only to reinforce the correctness of judicial rulings.

This court has recognized that when later proceedings confirm the correctness of the district court's findings, we can affirm a pre-trial suppression ruling based on such evidence. *See, e.g.*, *United States v. Han*, 74 F.3d 537, 539 (4th Cir. 1996) (citing cases); *see also United States v. Hicks*, 978 F.2d 722, 724-25 (D.C. Cir. 1992); *United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992). This ruling makes sense because all the facts pertinent to a suppression motion are not inevitably developed at a pre-trial hearing and both the trial court and the appellate court should not be precluded from taking note of a more comprehensive record supporting, as it does here, the district court's initial denial of the motion to suppress. *See Hicks*, 978 F.2d at 725. In adopting a contrary approach, the dissent would create an artificial barrier against ascertainment of truth, lowering the curtain well before the end of the play.

The whole idea of cordoning off suppression hearings and keeping them free from the supposed "taint" of subsequent sentencing proceedings is an artificial one. In either setting, a defendant has every opportunity to object to unreliable or untruthful evidence. *See United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (holding that a defendant may rebut or explain away evidence compiled in the presentence report). Indeed, Federal Rule of Criminal Procedure 32 is replete with procedural safeguards that afford the defendant and his attorney ample opportunity to present, orally and in writing, objections to anything in the presentence report. *See* Fed. R. Crim. P. 32(e)(2), (f)(1), (i)(1)(A), (i)(1)(C), (i)(1)(D); *see also* U.S.S.G. § 6A1.3 (2006). The Sentencing Guidelines reinforce these protections requiring the district court to "resolve with care" any disputed issues of fact which may bear on sentencing. U.S.S.G. § 6A1.3 (2006) (commentary). And a wrongly maligned defendant has every incentive to explain away any inaccuracy — often on pain of additional prison time. Notwithstanding all this, the dissent makes the astonishing suggestion that sentencing proceedings are not adversarial. *See infra* at 27-28. If this is true, then one wonders why counsel must be present, why defendant is given every opportunity to object, and why innumerable rules exist both to ensure accuracy and to safeguard a defendant's interests at sentencing.

There is no dispute that Askew received the benefit of all of these safeguards: His sentencing procedure complied with the Sentencing

Guidelines and the Rules of Criminal Procedure. Askew was provided with a copy of the presentence report, and, through his legal counsel, made three written objections. In support of these objections he submitted a thirteen page memorandum to the district court on February 24, 2005, and a second supplemental sentencing memorandum on March 7, 2005. At the sentencing hearing, the district court determined that Askew had been given an opportunity to read the report, had discussed it with his lawyer, and understood its contents. The court then held an evidentiary hearing, made findings of fact, and examined and heard oral argument on each of defendant's objections. The district court ruled on each of defendant's objections; adopted, with modification, the presentence report; and gave Askew a final opportunity to speak on any topic, asking "Mr. Askew, [is there] anything you'd like to say?" These extensive procedures afforded Askew every facet of due process. Further, the district court and this court have not moved beyond facts as adopted by the district court. Askew had every opportunity to, and did, challenge those facts below. Due process requires nothing more.

Under the dissent's inflexible view, however, *never* under *any* circumstance may evidence in a sentencing proceeding be used to confirm (or to rebut) a prior suppression ruling — no matter how reliable or relevant the evidence. In this, the dissent denies to the district court in the first instance and later to appellate courts the discretion to ascribe to evidence the weight it is entitled. To so rigidly bind the hands of a court in the face of probative evidence is per-seism at its worst.

It takes no clairvoyance to understand that the dissent envisions formalized suppression hearings themselves imbued with trial-like trappings. But, of course, suppression hearings, while properly observant of due process, are not meant to replicate trials. *See, e.g.*, *United States v. Matlock*, 415 U.S. 164, 175 (1974) (holding that there is "no automatic rule against the reception of hearsay evidence in [suppression] proceedings"). Under the dissent's view, not only would evidence be suppressed at trial, but there would now be suppressions from suppression rulings on the grounds that trial-like procedures are not in place. To adopt the dissent's approach would thus pile suppression upon suppression — at no small cost to the ascertainment of truth.

The dissent's protestations aside, nothing in our ruling will "discourage the use of conditional guilty pleas and force more trials." *See infra* at 37-38. A defendant will plead guilty when he gets a good deal and he will enter a conditional plea when he believes there is fair prospect that his Fourth Amendment claim will be sustained. None of this self-interested calculation is affected by our ruling in the least, because facts damaging to the defendant's suppression motion may also be uncovered if a defendant goes to trial.

The dissent argues, however, that to look to Askew's presentence admissions to confirm the correctness of a suppression ruling would vitiate the requirement that a guilty plea be deemed knowing and voluntary. *See infra* at 35-36. This is hardly the case. Federal Rule of Criminal Procedure 11 sets out the "information a court is to convey to assure that a defendant who pleads guilty understands the consequences of the plea." *Reno v. Koray*, 515 U.S. 50, 65 (1995) (Ginsburg, J., concurring). With respect to the "consequences of the plea," Congress amended Rule 11 to "identif[y] more specifically what must be explained to defendant": A court must "inform the defendant of and determine that he understands 'the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law for the offense to which the plea is offered.'" Fed. R. Crim. P. 11 (advisory comm. 1974 n.).

No one contends that the district court failed to comply with Rule 11's requirements here. Under Rule 11, there is no requirement that a judge inform a defendant about a number of collateral consequences of a guilty plea, such as parole eligibility, the fact that a jury might find him guilty of a lesser included offence, or that he might be subject to additional punishment by reason of his or her prior conviction, Fed. R. Crim. P. 11 (advisory comm. 1974 n.), much less a requirement that defendant be informed of the "full consequences" of his telling of the truth, *see infra* at 35. "As we have stated previously, the district courts are wholly capable of guaranteeing that guilty pleas are knowing and voluntary without flyspecking on the appellate level." *United States v. Wilson*, 81 F.3d 1300, 1308 (4th Cir. 1996).

Quite beyond the dissent's novel gloss on Rule 11, neither the government nor a defendant has any right to expect that the disposition of a suppression motion should be made on something other than the

facts of a case. The criminal justice system retains an interest in reliable suppression rulings. That interest would be undercut if the suppression of reliable evidence from suppression rulings were henceforth to be the standard.

The dissent makes much of the fact that the purpose of a sentencing hearing is sentencing, not suppression. Something is either true or it is not. A fact does not become true for sentencing purposes and false for some other purpose. If this logic were followed to its endpoint, evidence adduced at trial would also be out-of-bounds — for the purpose of a trial is ascertainment of guilt, not suppression. This view is foreclosed by our precedent which plainly allows for the consideration of post-suppression trial evidence. *See Han*, 74 F.3d at 539.

The dissent perceives a great injustice here because "[b]oth sides . . . understood that [sentencing] evidence . . . would be used only to determine an appropriate sentence." *See infra* at 37. This is not the case. While the plea agreement expressly prohibits the government from using such testimony "in any further criminal prosecutions or in determining the applicable guideline range," it contains no reference to, and thus no limitation on, the applicability of sentencing proceedings to the suppression ruling.

Defendant Askew obviously understood as much because he raised an objection to the presentence report on this very point. There, Askew objected to "any inference or any other statements in the presentence investigation report that states or tends to show that the search conducted of Mr. Gray's apartment was a legal search and seizure." The objection was deferred to the sentencing hearing, where it was repeated and subsequently overruled by the district court.

Put simply, nothing in the proceedings below requires the court to disregard evidence that might provide some insight to the correctness and appropriateness of the suppression ruling. To find otherwise would remove from courts the ability to ensure that their own suppression orders, whether granted or denied, are based upon a full and accurate set of facts. Courts do retain an interest in having their own orders not be shams. Moreover, had the evidence developed at sentencing been beneficial to the defendant, he would have no doubt urged this court to consider it when reviewing the suppression ruling.

In fact, defendant Gray argues before this court that evidence from the sentencing hearing supports his claim that the district court erred when it refused to suppress the testimony of Cole and Wallace, on the grounds that the testimony was too closely linked to a nonconsensual search. Gray, like any defendant, has the right to do this: the principle is not a one-way street, but one designed to ensure the accuracy and integrity of judicial rulings.

In sum, where, as here, the defendant has had adequate opportunity to object to the report; and the district court has adopted the presentence findings as reliable after consideration of defendant's objections, it is perfectly appropriate for an appellate court to take cognizance of confirmatory facts contained within the report.

## C.

In the case at hand, facts developed in Askew's Presentence Investigation Report and adopted by the district court as well as Askew's sentencing testimony leave no doubt that the district court correctly concluded that Askew's actions, viewed in their totality, left him with no legitimate expectation of privacy in the Altizer Avenue apartment. Indeed, to ignore relevant subsequent evidence on the considerable scale of Askew's drug operation would do a disservice both to the district court and to the notion that the criminal justice system should not lightly construct arbitrary barriers to the ascertainment of truth.

For example, Askew's Presentence Investigation Report as adopted by the district court revealed that the search of Gray's apartment recovered "cocaine base along with a .45 caliber semiautomatic Glock, a magazine and fifteen rounds, one box of 12-gauge shotgun slugs and drug paraphernalia." Askew's own presentence statements further confirm that the Gray-Askew association was a business one; Askew admitted to making an "agreement to pay Gray for selling drugs out of his house." The court concluded that the testimony indicated that Askew "was clearly involved in the trafficking of substantial amounts of cocaine base."

While the terms of the Gray-Askew agreement were never formalized, the district court's sentencing hearing findings also confirm that the Gray-Askew association was a business one. "[E]very factual ele-

ment," including the cash, scales, and presence and proximity of a gun, indicated that 5411 Rear Altizer Avenue was operating as a "crack house," the court noted. The court found no "other rational explanation for [$8,680] cash being carried on a person under these circumstances." In light of these facts, the district court was "convince[d]" that Gray and Askew "were doing *drug business*." In the district court's view, Askew's "explanation of saving [the cash] for college . . . just carr[ying] it around in the pocket of his pants, just doesn't measure up." "I find that beyond a reasonable doubt," the court stated. The district court's factual finding — that it was not college tuition rolled up in Askew's pants pocket — along with other facts brought to light during Askew's sentencing proceedings, confirms the correctness of the district court's conclusion that Askew had no legitimate expectation of privacy in Gray's home.

D.

Askew argues, however, that other facts point to the existence of a social relationship. According to Askew, he would visit Gray four or five times a week, spending several hours. They would watch tv, play video games, and "do other things" around the house. Askew kept a change of clothes, a toothbrush, and his Playstation console at Gray's home. Askew also testified that Gray had, on occasion, lent him a key and allowed him to spend the night. For his part, however, Gray could not remember any night during which Askew had stayed at the Altizer apartment.

Askew's recitation is less than a half-told tale and ignores extensive evidence before the district court. We are hard pressed to find that the presence of scattered personal possessions are sufficient to transform what was essentially a business relationship into a social one. If a change of clothes was sufficient to create a legitimate expectation of privacy, the Supreme Court's insistence that an expectation of privacy in commercial premises is "less than" the corresponding expectation of privacy in a home would be rendered meaningless. *See Carter*, 525 U.S. at 90. We also decline to create a toothbrush or Nintendo rule that would inflexibly mark a relationship as social in the face of testimony of extensive drug operations, replete with scales, large amounts of cash, neighborhood complaints, and multiple customers. Social interaction is, of course, incidental to many business

dealings. But were we to accept Askew's argument, the ancient maxim that a man's *home* is his castle would be turned on its head: a defendant's "castles" would dot the countryside. For not only would every person planning illegal activity have a legitimate expectation of privacy in his own home, but also in the home of every acquaintance where he could stash some personal belongings.

To be sure, not everyone who uses an illegal substance in someone else's home is thereby transformed into a business guest. Here, however, Askew did not go to Gray's apartment simply to use drugs; rather, the evidence shows that Askew used Gray's home to turn a profit. He ran his drug ring from the Altizer Avenue apartment: regularly selling cocaine base to multiple customers in the manner of a commercial enterprise.

Askew nonetheless claims that the time he spent in the apartment is alone sufficient to bring him within the ambit of the Fourth Amendment. We disagree. The fact that Askew engaged in a series of drug transactions, rather than a single drug sale, does not transform his asserted expectation of privacy into one "the law recognizes as legitimate." *Rakas*, 439 U.S. at 144 n.12. A business transaction does not change character simply because it is repeated. We reject a rule that accords members of ongoing drug operations heightened constitutional protection.

The dissent contends that "Askew was accepted into Gray's household" and that, given his "long-established and meaningful connections to both Gray and Gray's apartment, Askew could reasonably expect that his privacy would not be disturbed." *See infra* at 41 (alterations omitted). But, in its order denying suppression, the district court found that Askew was a mere "visitor" who had no "reasonable expectation of privacy in Mr. Gray's home."

Askew's attempt to fit his case within the holding of *Jones v. United States*, 362 U.S. 257 (1960), also fails. The defendant in that case, Jones, was essentially house-sitting. The apartment belonged to Jones's friend, Evans, who had gone out of town for "about five days." *Id.* at 259. Evans had given Jones the use of the apartment, and a key, with which Jones admitted himself on the day of the search. *Id.* Except with respect to the owner, "Jones had complete dominion

and control over the apartment and could exclude others from it." *Rakas*, 439 U.S. at 149 (interpreting *Jones*, 362 U.S. 257).

Askew cannot claim similar "dominion and control" over the Altizer Avenue apartment. On the day of the search, he did not have a key and was not planning on spending the night. There was no evidence that Askew exercised control or dominion over the residence, or that he had any private space in the home, as one would often expect with a social guest. And nothing suggests that he could have excluded the police or anyone else from the apartment. Moreover, the Supreme Court has repeatedly cautioned that the holding in *Jones* must not be extended beyond its specific facts. *See, e.g.*, *Carter*, 525 U.S. at 89-90; *Rakas*, 439 U.S. at 149; *compare infra* at 42 ("Askew need not show that his case is identical to *Jones*.").

This court's precedent also supports the fact that Askew does not have a legitimate expectation of privacy in Gray's residence. While we have recognized that persons other than overnight guests can have a legitimate expectation of privacy in the home of another, we have done so in the context of social visitors with near-familial relationships. *Bonner*, 81 F.3d at 475. In *Bonner*, the court allowed plaintiff in that case, Joyce Bonner, to assert a Fourth Amendment right in her section 1983 action. We emphasized the depth of the social relationship in that case: Bonner was a frequent visitor at Ms. Mealey's, a woman whom she and other community members called "Grandma"; her half-sister had been raised in Ms. Mealey's home; and she had previously lived in a neighboring building on the Mealey property. *Id.* at 475. In view of these social connections, we concluded that "Bonner's activities — visiting a neighbor and assisting the elderly — establish[ed] an expectation of privacy *that is 'recognized and permitted by society.'" Id.* at 475 (quoting *Olson*, 495 U.S. at 100) (emphasis added). Askew's drug trafficking activities are not rooted in similar understandings. Indeed, *Bonner* distinguished the situation presented here, noting that Bonner's case "differs from that of defendants . . . who are unable to suppress evidence because they have no legitimate expectation of privacy in the place searched." *Id.*

In short, Askew "treated the apartment as a base for his business operations, not as a sanctuary from outsiders." *United States v. Hicks*, 978 F.2d 722, 724 (D.C. Cir. 1992). The Tenth Circuit made this pre-

cise point when it held that a "business invitee who had permission from the owner to be on the premises for a specific purpose — to clean and repair the property" did not have "an objectively reasonable expectation of privacy in the premises that society [wa]s prepared to accept." *Higgins*, 282 F.3d at 1270. Similarly, in *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002), the Third Circuit affirmed the district court's denial of defendant's motion to suppress evidence because the court found "no evidence that [defendants] were at [a third party's] apartment for any purpose other than to engage in drug-related activities." Therefore, defendants had demonstrated no reasonable expectation of privacy in the apartment "that would permit them to claim the protection guaranteed by the Fourth Amendment." *Id.* at 336.

Finally, we note that although an individual can have an expectation of privacy in his workplace, *see O'Connor v. Ortega*, 480 U.S. 709 (1987), Askew does not claim such an expectation here. Even viewing Askew's Fourth Amendment challenge through the lens of commercial privacy, however, that challenge must fail. While the Supreme Court has held that a worker may have a reasonable expectation of privacy in the desk and file cabinets located in his own private office, *see id.* at 718-19, Askew was not in his own private office, but was conducting an extensive drug operation from someone else's home. A defendant cannot simply co-opt another's dwelling for illegal business enterprises. Thus, in *Minnesota v. Carter*, the Supreme Court distinguished similarly situated defendants who were "essentially present for a business transaction" from the "worker in *O'Connor* [who] had . . . his own private office." 525 U.S. at 90-91.

To sum up, the district court made the following findings: that 4511 Rear Altizer Avenue was operating as a "crack house"; that Gray and Askew "were doing drug business"; that Askew "was clearly involved in the trafficking of substantial amounts of cocaine base"; that Askew "did not have a reasonable expectation of privacy in Mr. Gray's home"; and that Askew had in fact demonstrated no reason "for his having a legitimate expectation of privacy in [Gray's] home." These conclusions rested in part upon the district court's ability to observe the demeanor of those witnesses involved, not least among them Askew himself. We thus conclude, in accord with substantial authority, that because Askew's purpose at 4511 Altizer Ave-

nue was patently commercial, he had no legitimate expectation of privacy in Gray's residence, and we affirm the district court's denial of Askew's motion to suppress the evidence discovered therein. *See, e.g., Perez*, 280 F.3d at 337 (holding no legitimate expectation of privacy where defendants were "in another's apartment for a short time for the business purpose of packaging cocaine"); *Higgins*, 282 F.3d at 1270-71 (holding no "objectively reasonable expectation of privacy" where defendant was a business invitee engaging in methamphetamine production); *United States v. Sturgis*, 238 F.3d 956, 958-59 (8th Cir. 2001) (holding defendant "plainly lacked a reasonable expectation of privacy in [a hotel] room" where defendant's purpose in visiting "was purely commercial"); *Gamez-Orduño*, 235 F.3d at 458 ("An individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location.").

IV.

A.

We now turn to Gray's contention that the district court erred in denying his motion to exclude the testimony of David Cole, Dora Wallace, and Terrence Askew as the tainted products of an illegal search. We note at the outset that since Gray had a legitimate expectation of privacy in his own dwelling he was plainly entitled to claim the Fourth Amendment's protections of the home. *See, e.g., Agnello*, 269 U.S. at 33. Based on its finding that Gray did not voluntarily consent to the warrantless search, the district court correctly excluded all of the physical evidence discovered by the search from the case against Gray. The question presented here is whether Gray can also exclude the witness testimony of Cole, Wallace, and Askew.

Whether evidence is tainted fruit requires a two-step analysis. The threshold question is whether testimonial evidence is the product of an illegal search. *New York v. Harris*, 495 U.S. 14, 19 (1990). Even if the evidence is the product of an unconstitutional search, it is nonetheless admissible if the causal connection between the evidence and the illegal conduct is attenuated. *Hudson v. Michigan*, 126 S. Ct. 2159, 2164 (2006). The question is thus "whether, granting establishment of the primary illegality, the evidence to which instant objection

is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quotation omitted).

The "standards for suppression of witness testimony are stricter than for physical evidence." *United States v. Najjar*, 300 F.3d 466, 479 (4th Cir. 2002). "[S]ince the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *United States v. Ceccolini*, 435 U.S. 268, 278 (1978); *Najjar*, 300 F.3d at 479 (same). Accordingly, "[t]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." *Ceccolini*, 435 U.S. at 280.

The primary focus of attenuation analysis is whether or not the deterrent purpose of the exclusionary rule is served by suppression. *Id.* at 275-76; *United States v. McKinnon*, 92 F.3d 244, 247 (4th Cir. 1996). In making this determination, *Ceccolini* directs us to consider first the "enormous cost" of "exclusion [that] would perpetually disable a witness from testifying about relevant and material facts." *Id.* at 277. The willingness of a witness to testify is a second factor that "represents a significant attenuation of the link between the police misconduct and its evidentiary fruits." *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980). As the Fifth Circuit put it, "One source of attenuation . . . is to be found in the exercise of the codefendants' own wills." *United States v. Houltin*, 566 F.2d 1027, 1032 (5th Cir. 1978). The court may also consider the role played by the illegally seized evidence in gaining the witness's cooperation; the proximity between the illegal search, the decision to cooperate, and the actual testimony; and the police motivation in conducting the search. *See Ceccolini*, 435 U.S. at 279-80; *McKinnon*, 92 F.3d at 247-48.

### B.

The testimony of David Cole and Dora Wallace is admissible under this framework. To begin with, Gray's challenge to Cole and Wallace's testimony does not meet *Ceccolini*'s threshold inquiry: the

search was not a but-for cause of their testimonies. *See Ceccolini*, 435 U.S. at 274; *Harris*, 495 U.S. at 19. The discovery of Cole and Wallace was unrelated to the illegal entry. It was pure happenstance that Cole and Wallace walked up to Gray's apartment to purchase drugs after the search was underway, rather than during the officers' lawful surveillance. Indeed, the officers were investigating the Gray residence precisely because neighbors had complained of drug-related foot traffic. This too suggests that the illegal entry was not a but-for cause of Cole and Wallace's testimony.

Even if the testimonies of Cole and Wallace were the product of an illegal search, but-for causality is a necessary, but not sufficient, ground for suppression. *Hudson*, 126 S. Ct. at 2164. Since any link between the testimonies and the unlawful search is attenuated, they are admissible under *Ceccolini*. Cole and Wallace voluntarily chose to speak with the officers. *See Ceccolini*, 435 U.S. at 276-77; *Najjar*, 300 F.3d at 479. As the district court found, Cole and Wallace's "decision to provide information to the officers was an exercise of free will sufficient to attenuate the taint of the illegal search."

Defendants argue, however, because both Cole and Wallace were under subpoena to appear at trial, and because Cole's testimony to the grand jury was pursuant to a subpoena (Wallace did not show up), their testimonies cannot be considered voluntary. But the initial statements given by Cole and Wallace to drug enforcement officers were not given under subpoena. Moreover, the fact that Cole and Wallace were required to show up does not mean that they were compelled to waive their own privileges and testify against Gray. We decline to hold that a meticulous prosecutor who obtains a subpoena to ensure that witnesses will be in the right place at the right time invariably renders any subsequent testimony "involuntary." As the Fifth Circuit found in similar circumstances, the fact that a refusal to testify "risk[s] being cited for contempt" does not alone "render it involuntary." *Houltin*, 566 F.2d at 1032.

Other factors support the district court's conclusion that the link between the unlawful entry and the testimony of Cole and Wallace is an attenuated one. To begin with, the statements made by Cole and Wallace merely provided background information relating to the alleged drug conspiracy, its modus operandi, and the roles of the vari-

ous players, not the evidence discovered during the illegal search. *See McKinnon*, 92 F.3d at 247-48. Wallace's testimony is also distant in time from the illegal search — she waited more than six months to give a statement to the police. And while Cole gave a statement to police on the day of the search, he did not testify before the grand jury for several months. Finally, there is no indication that officers conducted the search in the hope of obtaining testimony from Cole or Wallace. To suppress live witness testimony in such circumstances would place an inordinate strain on the truth-seeking function of courts while having a minimal deterrent effect on police behavior.

## C.

Gray next contends that the district court should have granted his motion to suppress Askew's testimony. He argues that Askew's testimony was not voluntary because it was secured by a plea agreement that Askew would not have made but for the illegally seized evidence obtained from Gray's home.

We disagree. To begin with, Askew had no Fourth Amendment right to object to evidence obtained from Gray's home. *See supra* Part II. Moreover, the existence of inculpatory evidence does not make a defendant's self-interested decision to bargain with the government involuntary. To the contrary, Askew's decision to offer his testimony in exchange for the dismissal of one charge was not coercion, but a deliberate and calculated choice motivated by his desire to receive a lesser sentence. Askew could have chosen to go to trial or to plead guilty without a plea agreement. Hard choices are choices nonetheless, and Askew's decision, however difficult, was voluntary. Other courts have held as much. *United States v. Akridge*, 346 F.3d 618, 630 (6th Cir. 2003) (testimony of codefendant testifying pursuant to a plea bargain admissible as a product of free will); *Leonardi*, 623 F.2d at 752-54 (same); *Houltin*, 566 F.2d at 1032 (testimony of codefendants testifying pursuant to use immunity admissible as a product of free will).

In search of a distinction, the dissent argues that each of these cases involve circumstances where the identity of the testifying co-defendant is already known to law enforcement officers pursuant to an independent source. *See infra* at 46-47. But there is every reason

to assume that where neighborhood complaints identified Rico Green as the mastermind behind the Altizer Avenue drug trafficking ring, lawful surveillance would have ultimately unearthed Rico Green's true identity. In any event, the point of those cases is that a defendant's choice to testify is a product of free will which may *itself* break the causal connection between the testimonial evidence and the illegal search.

Even if this general proposition could somehow be brought into question, the specifics of Askew's agreement do not lend themselves to a finding of involuntariness. His plea agreement, for example, was distant in time from the constitutional violation. It was entered into several months after the illegal search and thus a "product of detached reflection." *Ceccolini*, 435 U.S. at 277. Finally, we may not ignore the "enormous cost" of Gray's invitation to "permanently silenc[e]" Askew in light of the deterrent purpose of the exclusionary rule. *Id.* at 277, 280. Where, as here, there is no indication that law enforcement officers "searched with the intent of finding a willing and knowledgeable witness" the deterrent effect of exclusion is minimal. *See Ceccolini*, 435 U.S. at 280.[5] In so ruling, we are mindful of the Supreme Court's admonition that the exclusionary rule must be "our last resort, not our first impulse." *Hudson*, 126 S. Ct. at 2163.

V.

Intractability often suggests inevitability. So it is with illegal drugs. We seem resigned to the matter as to some low-grade national fever which we may never wholly shake.

---

[5]Defendant Gray argues that, because Askew was questioned about the evidence found in Gray's apartment, illegally seized evidence was used to gain Askew's cooperation. *See Ceccolini*, 435 U.S. at 279. But this again ignores the fact that the evidence obtained from the unlawful search was admissible as to Askew. *See supra* Part II. Moreover, much of the questionary evidence complained of by the defense — e.g., the money found in Askew's pocket and the cocaine base swallowed by Askew — was independently admissible against Askew because the evidence was obtained by search pursuant to lawful arrest. *See supra* note 3. As noted above, *see id.*, the district court found that "all statements [made by Askew] during th[e] pat down search were voluntary," not that they were the result of interrogation. *Id.*

Viewed in macro terms, that may be true. Viewed in broad societal terms, we may not be able to make much of a dent in the "drug problem." And yet viewed through the lens of a wrecked and shattered life, drugs are not an abstract "problem," but an all too concrete tragedy. Our court system, while hardly the whole answer, still brings to justice those who strip the lives of others of hope and potential and leave them to the toils of addiction.

Neither these nor any other observations would or should permit a disregard of Fourth Amendment values. And the district court accorded those values full respect. It ruled — properly — that the search here was not consensual. It ruled — properly — that the physical products of that search must be excluded as to Gray. But it also ruled — properly — that Askew did not have a legitimate expectation of privacy in someone else's apartment from which he dealt substantial quantities of illegal drugs. The court's rulings in their totality respected our Constitution and declined to allow a marginal and speculative gain in deterrent effect to negate the role of courts in holding accountable those who break our laws and profoundly wrong their fellow citizens. The judgment of the trial court is in all respects

*AFFIRMED*.

MICHAEL, Circuit Judge, dissenting:

First, I respectfully dissent from the majority's decision to affirm the district court's denial of Terrence Askew's motion to suppress evidence found pursuant to the illegal entry by police into Joshua Gray's apartment. Today, the majority expands the scope of appellate review of decisions on suppression motions in ways that are both troubling and unprecedented. The majority becomes the first court to hold that facts from a defendant's sentencing investigation and proceeding may be used in deciding a suppression appeal. An overriding problem with this new rule is that the procedures for establishing facts relevant to sentencing do not permit the presentation, adversarial testing, or judicial determination of facts with respect to suppression issues. Thus, the majority overlooks principles of due process when it allows suppression appeals to be decided by using facts from the sentencing process.

The majority admits that this sea change is unnecessary, for it says that "evidence found by the district court in its suppression order suffices to uphold the district court's suppression ruling." *Ante* at 11. Yet so eager is the majority to establish a precedent that it strains to find useable facts in Askew's presentence report. Thus, the majority is reduced to relying on the presentence report's account of the items seized (drugs, a gun, etc.) in the search of Gray's apartment, even though an undisputed list of these items was introduced in the suppression proceedings. Principles of judicial restraint suggest that our court should at least wait until facts from the sentencing process have some bearing on the outcome of a suppression appeal before deciding whether such facts may be considered. Nevertheless, the majority presses on to decide an issue of far-reaching consequence that is unnecessary to its judgment to affirm.

The majority also relies on admissions that Askew made in his presentence interview to support its decision to affirm the denial of Askew's motion to suppress. When Askew entered a conditional plea of guilty and preserved the right to appeal his suppression motion, he could not have anticipated that his own statements made during sentencing would be used against him by this court. Presentence interviews had never been used to decide suppression appeals, and the government granted Askew immunity barring the use of his statements in further prosecutions or in the determination of his guideline range for sentencing purposes. As a result, the majority's approach raises serious questions as to whether Askew's guilty plea can still be regarded as knowing and voluntary. In any event, the majority has ignored the principle of fair notice.

Finally, in rejecting Askew's suppression appeal, the majority relies on the district court's relevant conduct findings at Askew's sentencing hearing. This use of sentencing findings is also unprecedented, and in the long run it will detract from the vital process of determining relevant conduct for sentencing purposes. Both sides will now seek to relitigate suppression issues under the guise of contesting relevant conduct. As a result, district judges will be under pressure to guard against needless diversions in the sentencing process.

In its use of evidence and factfinding from the sentencing process, the majority abandons the approach followed (without controversy)

by every other court of appeals in reviewing suppression issues. Until today, these appeals were decided only on the basis of facts developed through the traditional adversarial process in a suppression hearing (or occasionally in a trial). One effect of the majority's decision is to marginalize the importance of factfinding conducted by district courts at suppression hearings. Another is to impair the ability of defendants to vindicate their constitutional rights on appeal. Yet another is to discourage defendants from entering into conditional guilty pleas at all.

Second, I respectfully dissent from the majority's affirmance of the district court's order denying Askew's suppression motion. The majority affirms on the ground that Askew and Gray had a business relationship, leaving Askew without a legitimate expectation of privacy in Gray's apartment. Although the majority says that the district court's factfinding in the suppression ruling allows this conclusion, it goes on to rely on evidence and factfinding from sentencing that have heretofore been off limits in a suppression appeal. In any case, undisputed facts establish that Askew's significant personal connection to Gray and his apartment gave Askew a Fourth Amendment privacy interest protecting him from unreasonable searches there.

Third, I respectfully dissent from the majority's affirmance of the district court's order that would have allowed Askew to testify at any trial of the government's case against Gray. Askew was discovered as a potential witness during what the district court found to be the illegal search of Gray's apartment. Askew's testimony should have been excluded because it was the tainted product of the illegal search.

I.

As a result of complaints about drug activity, police went to Gray's Altizer Avenue apartment in Huntington, West Virginia, on July 3, 2003, to conduct a "knock and talk." The officers did not apply for a search warrant because they knew their limited information did not amount to probable cause. Still, when Gray came to the door, the officers managed to push past him and enter the apartment without his consent. Once inside, the officers saw drugs, drug paraphernalia, and another man, Askew, who spent most of his days and many of his evenings as a guest at Gray's apartment. The police conducted a pat down search of Askew and found crack cocaine and a large amount

of cash. At that point the police obtained a search warrant, conducted a full search of the apartment, and seized drugs and evidence of drug dealing. Gray and Askew were indicted on two counts of conspiracy to distribute and possession with intent to distribute crack cocaine.

The district court granted Gray's motion to suppress all evidence from the July 3, 2003, apartment search as it related to him. The court denied Askew's motion to suppress, holding that he lacked standing to contest the search of Gray's apartment. Thereafter, Askew entered a conditional guilty plea to one count of the indictment, preserving his right to appeal the district court's order denying his motion to suppress. Gray also entered a conditional guilty plea to one count, preserving his right to appeal the district court's order allowing the government to use the testimony of three witnesses, Askew, David Cole, and Dora Wallace, who were discovered during the illegal search of Gray's apartment.

## II.

### A.

The majority concludes that Askew and Gray had a business relationship that left Askew without a privacy interest in Gray's apartment. In what it acknowledges to be an unnecessary step, the majority confirms this conclusion by taking facts from the record developed during Askew's sentencing process. In particular, the majority relies on facts taken from Askew's presentence interview (recounted in the presentence report) and from the district court's relevant conduct findings at the sentencing hearing. (I discuss specific pitfalls in using these sources in part II.B and C, *infra*.) In its most telling move, the majority uses the presentence report to say the report "*revealed* that the search of Gray's apartment recovered 'cocaine base along with a .45 caliber semiautomatic Glock, a magazine and fifteen rounds, one box of 12-gauge shotgun slugs and drug paraphernalia.'" *Ante* at 16 (quoting presentence report, J.A. 523) (emphasis added). This statement conveniently overlooks that the items seized in the search were revealed without objection in the suppression record long before the presentence report was prepared. The search warrant with an attached list of items seized was admitted into evidence at the suppression hearing, a police witness discussed several of the items (cocaine base,

ammunition box, and digital scales) at the hearing, and two govern-
ment memoranda submitted in the suppression proceedings listed the
items seized during the search.[1] The majority uses the presentence
report rendition of the items seized rather than the suppression pro-
ceeding record for an obvious reason: it allows the majority to
announce the precedent-setting holding that presentence report facts
from third-party sources may be used to decide suppression appeals.

The majority concedes that, as it views the case, none of the facts
it takes from the sentencing proceedings are necessary to affirm the
suppression ruling. These facts are simply "confirmatory," according
to the majority. *Ante* at 11. Restraint should have been the watchword
here. Instead, the majority has plunged ahead to establish a new rule
that threatens to weaken defendants' rights in the suppression arena
and needlessly encumber the sentencing process.

The procedures for establishing the facts relevant to sentencing do
not allow for the presentation, adversarial testing, or judicial determi-
nation of facts with respect to suppression issues. As a result, a defen-
dant's due process rights may be violated when an appellate court,
like the majority today, relies on facts from a presentence report in
reviewing a suppression ruling.

The majority's error is exposed by an examination of the process
for preparing the presentence report (the basic document for sentenc-
ing) and for resolving any objections to the report's factual assertions
*that are relevant to sentencing*. An essential purpose of the presen-
tence report is to provide the district court with facts that will assist
the court in determining an appropriate sentence. The probation offi-
cer collects and includes in the report a wide range of information
about the background, character, and conduct of the defendant. *See* 18
U.S.C. §§ 3552(a), 3661. The report encompasses a wide array of
hearsay and other information that is not subjected to adversarial test-
ing in a formal evidentiary proceeding. *See* U.S.S.G. § 6A1.3, com-
ment. (2006). The probation officer normally prepares the report after
interviewing the defendant and allowing him to give his account of
the offense and provide personal information about himself. The pro-

---

[1]The search warrant with the attached list of items seized is not in the
joint appendix, but it is available as part of the district court record.

bation officer then contacts the prosecution side to get its version of the offense and any other information it might have about the defendant's activities and background. The victim of the crime is also interviewed. Finally, the officer assembles other information helpful in sentencing, including information about the defendant's family responsibilities and his criminal, medical, educational, financial, and employment record. *See* 5 Wayne R. LaFave et al., *Criminal Procedure* § 26.5(b) (2d ed. 1989).

Because the purpose of the presentence report is to aid the district court in sentencing, the procedures for resolving disputes about information contained in the report are limited to matters relevant to sentencing. Thus, "[w]hen any factor *important to the sentencing determination* is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the [district] court regarding that factor." U.S.S.G. § 6A1.3(a), p.s. (emphasis added). The court then resolves the dispute at the sentencing hearing in accordance with Rule 32(i) of the Federal Rules of Criminal Procedure. *See* U.S.S.G. § 6A1.3(b), p.s. Rule 32(i) makes clear that a district court need not resolve disputes over the content of a presentence report when the "controverted matter . . . will not affect sentencing, or [when] the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). These rules are designed to promote the "'focused, adversarial resolution of the legal and factual issues' critical to sentencing" without the distraction of relitigating non-sentencing matters that might be contested on appeal. *United States v. Blatstein*, 482 F.3d 725, 731 (4th Cir. 2007) (quoting *Burns v. United States*, 501 U.S. 129, 137 (1991)).

In short, suppression-related factfinding is not meant to be reopened during the process for gathering sentencing facts that begins with the preparation of the presentence report and ends with the sentencing hearing. Facts that would have had some relevance at the suppression hearing may well surface in the sentencing process. But those facts are not subjected to rebuttal, other adversarial testing, or judicial scrutiny insofar as they might be relevant to suppression. For that reason they should not be used by an appellate court in reviewing a suppression ruling.

Today marks the first time an appellate court has affirmed a pretrial suppression ruling based on facts taken from a presentence report or sentencing findings. This unprecedented step passes muster, the majority believes, because an appeals court "may consider evidence adduced at trial" to affirm a pretrial suppression motion. *United States v. Han*, 74 F.3d 537, 539 (4th Cir. 1996). Considering facts from the trial record in a suppression appeal makes some sense because the full measure of constitutional and procedural protections governing the development of evidence (for example, confrontation, cross-examination, and compulsory process) are still available to the defendant.[2] Moreover, suppression issues have the potential to be reopened during trial because the defendant may renew at trial a pretrial suppression motion. *See, e.g.*, *Raddatz*, 447 U.S. at 678 n.6 ("Nothing . . . precludes renewal at trial of a motion to suppress evidence even though such motion was denied before trial."). However, once a defendant, with the agreement of the government, enters a conditional guilty plea with the right to appeal a suppression ruling, the parties have signaled that they are content to have the record closed for the suppression appeal.

Once guilt is established, and the preparation for sentencing begins, suppression issues should be off limits. The procedural protections attending the development and use of facts for sentencing are not designed to, and may consequently fail to, afford the defendant fair

---

[2]A defendant also has substantial constitutional and procedural protections at a pretrial suppression hearing, *see United States v. Raddatz*, 447 U.S. 667, 679 (1980), even though they do not equal those available at trial. There is, of course, "no automatic rule against the reception of hearsay evidence in [suppression] proceedings," *United States v. Matlock*, 415 U.S. 164, 175 (1974), but a witness offering hearsay testimony is subject to cross-examination, *see McCray v. Illinois*, 386 U.S. 300, 313 (1967). In any case, elemental due process ensures that a defendant at a suppression hearing retains the core of the rights to confrontation, cross-examination, and compulsory process. *See, e.g.*, *United States v. Stewart*, 93 F.3d 189, 192-93 n.1 (5th Cir. 1996); *United States v. Macklin*, 902 F.2d 1320, 1329-30 (8th Cir. 1990); *United States v. De Los Santos*, 810 F.2d 1326, 1335 (5th Cir. 1987); *United States v. Bowe*, 698 F.2d 560, 565 (2d Cir. 1983); *United States v. Green*, 670 F.2d 1148, 1154 (D.C. Cir. 1981).

consideration of his Fourth Amendment claim. Thus, it is not surprising that the majority has no company in its approach.

An example illustrates why sentencing evidence should not be used to decide a suppression appeal. Consider a defendant who, like Askew, has entered a conditional guilty plea to a drug charge while preserving a suppression appeal on the ground that he had a privacy interest in the place searched, a friend's apartment, where he was found in possession of drugs and tools of the drug trade. Several background facts are included in the presentence report that are relevant to suppression, but do not bear materially on sentencing. In particular, the presentence report includes the hearsay statement of a person (not a witness at the suppression hearing) who said that the defendant was an infrequent visitor at the apartment and was not a close friend of the lessee. The defendant objects to this statement on the ground that it is incorrect and the source lacks credibility. The district court overrules the objection because the facts in the statement do not bear on the sentencing determination, and the court then adopts the presentence report. After today the defendant is stuck with these untested facts from his presentence report in any suppression appeal. As a result, the majority's approach paves the way for suppression appeals to be decided with evidence that is not subjected to full and fair adversarial testing.

The majority attempts to justify its position by saying that "the criminal justice system should not lightly construct arbitrary barriers to the ascertainment of truth." *Ante* at 16. But restricting appellate review to evidence that has been subjected to meaningful adversarial testing is hardly an arbitrary barrier. Nor is it inconsistent with ascertaining the truth. *Cf. California v. Green*, 399 U.S. 149, 158 (1970) (cross-examination, as the core of the adversarial process, is "the greatest legal engine ever invented for the discovery of truth") (internal quotation omitted).

The majority insists that excluding sentencing evidence from the record to be considered in suppression appeals is at odds with "common sense and the aims of the criminal justice system." *Ante* at 11. This language sounds good, but it should fool no one. It overlooks the fact that our court today rejects the universal practice of deciding suppression appeals without reference to the sentencing record. The over-

drawn rhetoric also obscures what is actually at stake for the criminal justice system. Like the majority, I fully believe that "[t]here is no gainsaying that arriving at the truth is a fundamental goal of our legal system." *James v. Illinois*, 493 U.S. 307, 311 (1990)(quoting *United States v. Havens*, 446 U.S. 620, 626 (1980)). But it is also the case that "various constitutional rules limit the means by which government [and this court] may conduct this search for truth in order to promote other values embraced by the Framers and cherished throughout our Nation's history." *James*, 493 U.S. at 311. Because the procedural safeguards attending to sentencing do not provide for a full and fair airing of suppression-related facts, respect for a defendant's due process rights requires us to decide a suppression appeal on the facts developed at the suppression hearing.[3]

---

[3]The majority claims that today's new rule "is not a one-way street," *ante* at 16, and will also allow defendants to rely on sentencing evidence in a suppression appeal. In practice, however, this rule will be of little benefit to defendants. First, the government has the statutory right to take an interlocutory appeal from a pretrial ruling that suppresses or excludes evidence in a criminal case. 18 U.S.C. § 3731. In that situation the defendant has won a suppression motion, but he will have no sentencing evidence to rely on in the interlocutory appeal. On the other hand, when the defendant loses a suppression motion, both sides will be able to rely on sentencing evidence in the defendant's appeal of the adverse ruling. This scheme gives the government an advantage. When the defendant loses a suppression motion, the government will have the opportunity to use evidence from the sentencing process to bolster its case in opposition to suppression. A defendant who wins a suppression motion, and must defend his favorable ruling in an interlocutory appeal by the government, has no second chance to shore up his case for suppression. Second, the majority's equal benefit example from this case is unconvincing. The majority says that Gray in his appeal properly relies on sentencing evidence to argue that the district court erred in denying his pretrial motion to suppress the testimony of Cole and Wallace as the tainted product of the illegal search of Gray's apartment. Gray's reliance on this sentencing evidence is futile, however, for the majority does not use the evidence to reverse the district court; it affirms the decision that would have allowed Cole and Wallace to testify.

In any event, if the majority had used sentencing evidence to reverse the district court's ruling to admit the testimony of Cole and Wallace, it would have been unfair to the government. Parties depend on district

### B.

In support of its conclusion that Askew and Gray had a business relationship, the majority relies on Askew's presentence interview admissions as recounted by the probation officer in the presentence report. The use of Askew's own statements against him raises a different set of concerns than does the use of third-party evidence from a presentence report. For a guilty plea to be deemed knowing and voluntary, the district court must first determine "whether the defendant actually *does* understand the significance and consequences of [the] particular decision [to plead guilty]." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993). At no point during his plea hearing was Askew ever informed by the district court that his own statements made during the sentencing process could be used against him in his suppression appeal. Of course, this omission is not the fault of the district court. Because no court of appeals had ever considered sentencing evidence in its review of a suppression motion before today, neither the district court nor Askew had any reason to expect that Askew's complete cooperation during the sentencing process (which was required of him under the terms of his plea agreement) might work to his detriment in this appeal. Indeed, in his supplemental sentencing memorandum Askew reminded the district court that his presentence report admissions — the very admissions now relied on by the majority — "should only be viewed by [the district court] in finding that Mr. Askew has accepted responsibility for his actions, and for *no other purpose*." J.A. 361-62. (emphasis added). This reminder was based on the government's plea agreement grant of use immunity to Askew, which shielded his statements from use against him in "further criminal prosecutions or in determining the applicable guideline range" in his case. J.A. 230. Thus, Askew could not have been aware of the full consequences of recounting his version of his offense to the probation officer, and this circumstance raises serious questions as to

---

courts to rule on motions to suppress testimony on the basis of the evidence presented in pretrial (or sometimes trial) proceedings. This time-honored approach brings stability and reliability to the trial process, and an appellate court should not second-guess district court decisions to admit or exclude testimony on the basis of evidence that comes to light later at sentencing.

whether his conditional guilty plea can still be regarded as knowing and voluntary.

In sum, Askew could not have anticipated the Hobson's choice that the majority offers today to future defendants contemplating a conditional guilty plea. Under the majority's approach, full cooperation during sentencing may turn out to be fatal to a Fourth Amendment appeal. However grim his options, Askew surely had a right to make a knowing choice between them. When he entered his conditional plea of guilty, Askew did not know that by submitting to a presentence interview he might end up a witness against himself in his suppression appeal. Given this lack of notice, Askew's own statements should not be used by the majority today.

C.

In yet another first for appellate courts, the majority relies on the district court's relevant conduct findings at Askew's sentencing hearing to support its conclusion that Askew had no privacy interest in Gray's apartment. For example, the majority relies on the district court's findings about the cash recovered from Askew in connection with its determination of drug weights attributable to Askew for sentencing. A district court's determination of the defendant's relevant conduct has long been recognized as a critical component of the federal sentencing process. *See* William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495 (1990). After today the relevant conduct inquiry and determination will bear on more than sentencing. It will also bear on the appeal of decisions on suppression motions. The relevant conduct inquiry should be confined to the determination of an appropriate sentence. It is bad policy to allow suppression issues to creep into sentencing, and that will surely happen after today's decision. Both the defendant and the government will now have every incentive to attempt to relitigate suppression issues under the guise of contesting relevant conduct. This diversion will detract from the "focused, adversarial resolution of the issues . . . critical to sentencing." *Blatstein*, 482 F.3d at 731 (internal quotation marks and citation omitted).

## D.

The majority fails to appreciate that its new approach will discourage the use of conditional guilty pleas, detract from the sentencing process, and frustrate district judges. Under Fed. R. Crim. P. 11(a)(2) "a defendant may enter a conditional plea of guilty . . . reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion," such as a motion to suppress. If facts in a presentence report and evidence or findings at sentencing can determine the scope of Fourth Amendment protections to be decided on appeal, the likelihood that a defendant will choose to enter a conditional guilty plea will be reduced. Conditional guilty pleas have heretofore served an important purpose by "reliev[ing] the problem of congested criminal trial calendars in a manner that does not diminish the opportunity for the assertion of rights guaranteed by the Constitution." *Lefkowitz v. Newsome*, 420 U.S. 283, 293 (1975).

Before today when a defendant entered a plea of guilty on the condition that he could appeal a suppression ruling, both he and the government understood that the suppression appeal would be decided on the record from the suppression hearing. Both sides also understood that evidence provided to the probation officer and to the court in the sentencing process would be used only to determine an appropriate sentence.[4] After today both sides will be providing information in the

---

[4]Although the majority's approach in using sentencing evidence to determine the scope of a defendant's Fourth Amendment rights is wholly without precedent, the majority asserts that Askew somehow anticipated that such evidence would be used in his suppression appeal. *See ante* at 15. This claim is not borne out by the record. Askew's lawyer objected to "any inference or other statements in the pre-sentence report that state or tend to show that the police search of Mr. Gray's apartment was a legal search and seizure." J.A. 450; *see* J.A. 535. The objection, as explained fully in the addendum to the presentence report, went to the report's reflection of law enforcement's version of the search, which was that Gray had consented to it. Thus, Askew's lawyer pointed out in his objection that the district court had ruled that "the search [of Gray's apartment] was illegal and this [ruling] should be noted in the Presentence Investigation Report." J.A. 535. The objection — in light of the scope of appellate review at the time it was made — is best understood

sentencing process with the additional goal of making a better record for appellate review of the suppression ruling. This practice will diminish a defendant's ability to assert his Fourth Amendment rights on appeal. It will allow the government, with its substantial investigative resources, to steer facts of unassessed reliability into the presentence report, facts that are aimed solely to bolster its case for affirming the denial of the suppression motion. The overall effect will be to discourage the use of conditional guilty pleas and force more trials or straight guilty pleas that strip defendants of appeal rights.

In short, the majority's approach has nothing to recommend it, neither judicial economy, sentencing process integrity, nor protection of defendants' constitutional rights.

### III.

I also respectfully disagree with the majority on the merits of Askew's suppression motion.

### A.

The Fourth Amendment speaks of "[t]he right of the people to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. Fourth Amendment rights are personal and "may be enforced . . . only at the instance of one whose own protection was infringed by [a] search." *Rakas v. Illinois*, 439 U.S. 128, 138 (1978) (quoting *Simmons v. United States*, 390 U.S. 377, 389 (1968)). A per-

---

as an effort by Askew to avoid any waiver of his suppression appeal by conceding that the search had been consensual. In ruling on the objection, the district court stated that "[t]he pre-sentence report doesn't indicate whether the search was legal or illegal." J.A. 451. Regardless of the objection, the illegality of the officers' entry and search was conclusively decided by the district court and is not challenged on appeal. The only issue in Askew's appeal is whether he had a legitimate expectation of privacy that was violated as a result of the unconstitutional search. There is nothing in the record indicating that Askew anticipated that his expectation of privacy would be determined on the basis of facts from the sentencing process.

son invoking the protections of the Fourth Amendment must have a legitimate expectation of privacy in the place searched. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). More specifically, he must have an actual (or subjective) expectation of privacy, and his subjective expectation must be "one that society is prepared to recognize as reasonable." *Id.* (internal quotation marks and citation omitted). "[A] person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas*, 439 U.S. at 142. For example, the Supreme Court has recognized that legitimate expectations of privacy can be held by overnight guests, *Minnesota v. Olson*, 495 U.S. 91, 95 (1998), employees in shared offices, *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968), and persons making business calls from public telephone booths, *Katz v. United States*, 389 U.S. 347, 353 (1967).

The majority, in concluding that Askew lacked a legitimate expectation of privacy in Gray's apartment, proceeds as if the Supreme Court in *Minnesota v. Carter*, 525 U.S. 83 (1999), categorically removed business guests in another's home from the protections of the Fourth Amendment. But *Carter* did no such thing. The issue in *Carter* was whether two men who used the apartment of a third man for two and one-half hours for the *sole* purpose of bagging cocaine had a legitimate expectation of privacy in the apartment. Neither of the *Carter* defendants had a prior relationship with the tenant, and they proffered no evidence showing "acceptance into the household." *Id.* at 90. In return for their use of the apartment as "simply a place to do business," *id.*, the defendants paid the tenant with a small amount of cocaine. The combination of "the *purely* commercial nature of the transaction engaged in [ ], the relatively short period of time on the premises, and the lack of any previous connection between [the defendants] and the householder" led the Court to conclude that any search did not violate the defendants' Fourth Amendment rights. *Id.* at 91 (emphasis added).

The facts in today's case establish that Askew's status is quite unlike that of the *Carter* defendants, who had only a "fleeting and insubstantial connection" with the apartment in question. *Id*. at 102 (Kennedy, J., concurring). Here, the district court found that "Askew typically visited [ ] Gray four to five days a week, spending several

hours each time he visited" Gray's Altizer Avenue apartment. J.A. 152. This finding was based on Askew's testimony that he generally spent about six hours per day at Gray's, but sometimes extended these hours by staying late into the night. The court also found that Askew "occasionally spent the night" at Gray's. J.A. 152. This happened "maybe four or five times," according to Askew. J.A. 107. "Askew kept some personal items at [ ] Gray's including a change of clothes, a toothbrush, and his Playstation [video game] console," according to the district court's findings. J.A. 152. Finally, the court found that when Askew was at Gray's apartment, the two men "would watch movies [together], play video games or do other things around the house." *Id.* The district court's findings are supported and amplified by other undisputed facts presented at the suppression hearing. Askew bought groceries for the Gray apartment and spent "some time" there when Gray was not present. J.A. 108. On several occasions, Gray provided Askew with a key to the apartment, and Gray testified that Askew "probably" had the authority to deny entry to third parties. J.A. 88. Askew's privileges at Gray's Altizer Avenue apartment were a continuation of privileges Gray had extended to him at Gray's previous apartment on Collis Avenue in Huntington, where Askew had "spen[t] quite a few nights." J.A. 87. In sum, Askew and Gray had a close personal relationship that prompted Gray to welcome Askew to spend about a quarter of his daily life, including his leisure time, at Gray's apartment.

The majority minimizes or ignores these facts — all taken from the district court's findings following the suppression hearing and from evidence introduced at that hearing — and characterizes Gray and Askew as having "essentially a business relationship." *Ante* at 17. In any event, I do not contest that the evidence presented at the suppression hearing, when viewed in the light most favorable to the government, supports an inference that Askew was using Gray's apartment in part for his own business purpose (drug dealing). The business aspect is a factor to be weighed in determining whether Askew had a legitimate expectation of privacy in the apartment. *See Carter*, 525 U.S. at 91; *cf. New York v. Burger*, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home."). The drug dealing factor does not by itself resolve the matter, however, because *Carter* did not draw a bright line rule between

social and business guests by entitling the former to the protections of the Fourth Amendment and disentitling the latter. *See United States v. Higgins*, 282 F.3d 1261, 1271 (10th Cir. 2002). Indeed, the particular guest label affixed to Askew matters far less than whether he has established a "meaningful tie or connection to the [tenant], the [tenant's] home or the [tenant's] expectation of privacy." *Carter*, 525 U.S. at 102 (Kennedy, J., concurring).

The circumstances of Askew's regular presence at Gray's apartment make clear that he was the kind of "houseguest [who] has a legitimate expectation of privacy in his host's home." *Olson*, 495 U.S. at 98. Askew was "accept[ed] into [Gray's] household," *Carter*, 525 U.S. at 90, as shown by the frequency and length of his visits, his participation with Gray in social activities at the apartment (playing video games and watching movies), the personal possessions that he kept there, his occasional possession of a key to the apartment, his ability to spend time there alone, his purchase of groceries for the apartment, and his probable authority to exclude others from the apartment. Given his long-established and meaningful connections to both Gray and Gray's apartment, Askew could reasonably expect that his privacy "w[ould] not be disturbed by anyone but his host and those his host allows inside." *Olson*, 495 U.S. at 99.

An expectation of privacy in Askew's case is consistent with *Carter* because in *Carter* the Court did not focus exclusively on the commercial nature of the visitors' conduct but also considered the "time [they spent] on the premises" and whether there was "any previous connection between [the visitors] and the householder." *Carter*, 525 U.S. at 91. Indeed, the majority's misreading of *Carter* to give determinative weight to the commercial aspects of visits that are both commercial and social has been rejected by both the Ninth and Tenth Circuits in the very cases the majority cites for support. *Ante* at 8; *see United States v. Rhiger*, 315 F.3d 1283, 1287 (10th Cir. 2003) (despite his joint participation in methamphetamine production at another's home, defendant's "ongoing and meaningful connection" to the home over a two-week period, including several overnight stays, gave him standing to challenge search); *United States v. Gamez-Orduño*, 235 F.3d 453, 459 (9th Cir. 2000) (defendants transporting marihuana, who stayed as guests one night in the home of strangers, had a legitimate expectation of privacy in that home). The Sixth Cir-

cuit has also rejected the majority's expansive reading of *Carter*. *See United States v. Pollard*, 215 F.3d 643, 647-48 (6th Cir. 2000) (defendant selling cocaine out of another's home had a legitimate expectation of privacy there because of his relationship to the householder, his storage of personal belongings in the home, and his occasional overnight stays there).

Moreover, the majority's reasoning is irreconcilable with *Jones v. United States*, 362 U.S. 257 (1960). Although the majority describes the defendant in *Jones* as "essentially house-sitting" in the apartment of an absent friend, *ante* at 18, the facts recounted by the Supreme Court make it abundantly clear that Jones was selling heroin out of the apartment, *Jones*, 362 U.S. at 267-68 n.2. Jones had a key to the apartment, kept a suit and shirt there, and had slept there "maybe a night." *Id.* at 259. The fact that Jones was using the apartment as a base for commercial conduct did not prevent the Supreme Court from holding that a search of the apartment violated Jones's Fourth Amendment rights. Nor did Jones's commercial activity prevent the Court in *Carter* from explicitly reaffirming *Jones*'s holding. 525 U.S. at 90. In attempting to distinguish this case from *Jones*, the majority overstates the significance of the fact that Jones, unlike Askew, had a key at the time of the search. In *Minnesota v. Olson* the Supreme Court made clear that "untrammeled power to admit and exclude" is not essential to gaining Fourth Amendment protection. 495 U.S. 91, 99-100 (1990). At any rate, Askew need not show that his case is identical to *Jones*. Askew had a legitimate expectation of privacy in Gray's apartment because of his "on-going and meaningful connection" to Gray and the apartment. *Rhiger*, 315 F.3d at 1287.

B.

The majority's holding that a person's "patently commercial" use of a place permits "no legitimate expectation of privacy," *ante* at 21, creates another problem. This holding cannot be reconciled with the well-established principle that an individual "may have a reasonable expectation of privacy" in his place of work. *See O'Connor v. Ortega*, 480 U.S. 709, 719 (1987) (holding that a psychiatrist employed by a state hospital had a reasonable expectation of privacy in his office); *Mancusi*, 392 U.S. at 369 (holding that a union official had a reason-

able expectation of privacy in office consisting of one room shared with other officials).

The majority describes Gray's apartment as the locus of "a commercial enterprise" with "multiple customers" where repeated "business transaction[s]" occurred. *Ante* at 18. Likewise, Askew's purpose for being in the apartment is deemed "patently commercial." *Id.* at 21. Yet the majority does not, and cannot, dispute that an individual can have the kind of "significant [ ] connection" to his workplace that entitles him to the Fourth Amendment's protections. *Carter*, 525 U.S. at 91. Thus, simply calling Askew's conduct commercial does nothing to answer the key question, that is, even assuming that Gray's apartment served as Askew's regular workplace in the drug trade, did Askew nevertheless have a legitimate expectation that his privacy there would not be violated by warrantless police intrusion. The majority attempts to dodge this question by contending that Askew had no expectation of privacy in the apartment for two reasons: (1) it "was not [ ] his own private office" and (2) "[a] defendant cannot simply co-opt another's dwelling for illegal business enterprises." *Ante* at 20. These pronouncements do not defeat Askew's privacy expectations.

First, it does not matter that Gray's apartment was not Askew's "own private office." The union official in *Mancusi* shared his office with other union officials, but his privacy interests in the office were sufficient to allow him to challenge its warrantless search. The official had Fourth Amendment protection because he could "reasonably have expected that only [his officemates] and their personal or business guests would enter the office." 392 U.S. at 369; *see also Ortega*, 480 U.S. at 730 (Scalia, J., concurring) ("[O]ne's personal office is constitutionally protected against warrantless intrusions by the police, even though employer and co-workers are not excluded."). Second, the record does not permit the conclusion on appeal that Askew co-opted or appropriated Gray's apartment to conduct illegal business. Askew's presence in Gray's home was nothing but consensual. This is not a case where a person lacks enforceable privacy rights because he was on the premises of another without consent. *See, e.g., United States v. Jones*, 213 F.3d 1253, 1260 (10th Cir. 2000). Thus, even if the apartment is viewed as a workplace, the majority offers no cogent reason for dashing Askew's reasonable expectation of privacy.

In the end it appears that the majority's decision would be the same regardless of whether the apartment is treated as a home, a workplace, or some combination of the two. The majority explains its wholesale rejection of all of the evidence that establishes Askew's ongoing personal connection to the apartment with one sweeping pronouncement: "We reject a rule that accords members of ongoing drug operations heightened constitutional protection." *Ante* at 18. But basic constitutional protection is all that Askew seeks, and Fourth Amendment rights have never hinged on whether a defendant's activities were innocent or criminal. Instead, the "guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike." *McDonald v. United States*, 335 U.S. 451, 453 (1948). This point is confirmed in *Minnesota v. Olson*, where the defendant had a legitimate expectation of privacy as an overnight guest in a home where he was essentially hiding because he was wanted for armed robbery and murder. 495 U.S. at 94-95. As a leading commentator explains, "to deny standing merely because it turns out the defendant had a criminal purpose is in sharp conflict with the rationale underlying the exclusionary rule." 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.3(b) at 162 n.141 (4th ed. 2004) (listing cases). Indeed, most "Fourth Amendment issues arise precisely because the defendants were engaged in illegal activity on the premises for which they claim privacy interests." *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997). In short, the fact that Askew engaged in illegal activity at the apartment does not foreclose him from invoking the protection of the Fourth Amendment.

## C.

Askew had a longstanding and meaningful connection to Gray's apartment as a regular guest with special privileges. As a result, Askew had a legitimate expectation of privacy in the apartment that was protected by the Fourth Amendment. The district court's order denying Askew's suppression motion should therefore be reversed.

## IV.

Finally, I respectfully disagree with the majority's determination that Askew could have testified against Gray. It is settled in this case that the search of Gray's apartment violated his Fourth Amendment

rights. Askew's prospective testimony against Gray was "so closely, almost inextricably, linked" to the illegal search that it should have been suppressed. *United States v. Rubalcava-Montoya*, 597 F.2d 140, 144 (9th Cir. 1978). Because Askew's testimony was the tainted product of the illegal search, I would reverse the district court's order denying Gray's motion to exclude Askew's testimony.

The "degree of free will" exercised by a potential witness is critical to determining whether his prospective testimony is sufficiently attenuated from an illegal search. *United States v. Ceccolini*, 435 U.S. 268, 276 (1978). The "time, place, and manner of [law enforcement's] initial questioning of the witness" are examined to determine whether his statements "are truly the product of detached reflection and a desire to be cooperative." *Id.* at 277. The free will inquiry is supplemented by an examination of the following additional factors:

> whether the illegally-seized evidence was used in questioning the witness; the time between the illegal search and initial contact with the witness; whether the investigators knew of the relationship between the witness and the defendant prior to their illegal search; and whether the police conducted the illegal search intending to find evidence implicating the defendant.

*United States v. McKinnon*, 92 F.3d 244, 247-48 (4th Cir. 1996) (citing *Ceccolini*, 435 U.S. at 279-80). Consideration of the *Ceccolini-McKinnon* factors compels the conclusion that Askew's prospective testimony against Gray should have been suppressed. First, illegally seized evidence formed the basis of police questioning of Askew: he was asked about the cash and crack recovered from his clothing during a warrantless search that violated his Fourth Amendment rights. *See supra* part I.[5] Askew's decision to testify was hardly voluntary,

---

[5]The district court admitted evidence found on Askew's person because the court found that this search was pursuant to his lawful arrest. Of course, the arrest would only have been lawful if it had been based on probable cause. *See United States v. Robinson*, 414 U.S. 218, 235 (1973). Probable cause for Askew's arrest was purportedly established with evidence from the initial (warrantless) search of the apartment that ought to have been suppressed as to Askew just as it was with respect to Gray. The police therefore lacked probable cause for Askew's arrest, which means that evidence from the pat-down search was illegally seized.

given what he faced. The district court erroneously concluded that Askew could not challenge the police's illegal entry into Gray's apartment. This meant that the evidence found (drugs, cash, etc.) would be admissible against him. Second, no time elapsed between the illegal search and the police's initial contact with Askew. Third, before unlawfully entering Gray's apartment, the police had no knowledge of the relationship between Gray and Askew, nor were they even aware of the true identities of the two men. Fourth, the police knew that they lacked probable cause when they arrived at Gray's apartment, so it is apparent that they took advantage of an opportunity to push their way in, intent on finding evidence of drug dealing. These factors, which the majority does not specifically consider, all demonstrate a close link between the illegal search and Askew's prospective testimony.

The majority focuses on *Ceccolini*'s free will factor, concluding that Askew's decision to testify against Gray was entirely voluntary. Faced with the consequences of the district court's erroneous ruling, Askew entered into a plea agreement that required him to testify against Gray in return for the dismissal of one of the two felony counts against him. The circumstances surrounding Askew's agreement to testify "strongly suggest that he [would] not [be testifying] of a free will uninfluenced by the initial illegality." *United States v. Ienco*, 182 F.3d 517, 530 (7th Cir. 1999). Instead, Askew's decision was "dictated by his own precarious legal situation" resulting from the district court's admission of illegally seized evidence. *Id.*

I recognize that there are many cases in which a co-defendant's testimony is sufficiently attenuated from the unlawful search as to be admissible. In all of the cases cited by the majority, the identity of the testifying co-defendant was already known to law enforcement in advance of the illegal search. *See United States v. Akridge*, 346 F.3d 618, 627 (6th Cir. 2003); *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980); *United States v. Houltin*, 566 F.2d 1027, 1031 (5th Cir. 1978). In *Houltin*, for example, the testifying co-defendants and their illegal activities had been "under extensive investigation for narcotics smuggling activities" for several years before they were illegally wiretapped. 566 F.2d at 1031 n.4 (internal quotation omitted). The government's independent knowledge of the co-defendants was thus sufficient to overcome any link between the Fourth Amendment

violation and their later decision to testify. In the matter before us, not only were the police unaware of Askew's true identity, the government's entire case against him was the product of the illegal search. There is simply no attenuation to be found.

Because the record before us shows an unbroken causal link between the illegal search and Askew's decision to testify against Gray, I would reverse the district court's determination that Askew's testimony was admissible.