**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4755

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

FARUQ ROSE, a/k/a Faruq Uthman Rose,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Dever III, District Judge. (7:17−cr−00069−D−1)

Argued: January 29, 2021                    Decided: July 9, 2021

Before GREGORY, Chief Judge, KEENAN, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Keenan wrote the majority opinion, in which Judge Quattlebaum joined. Chief Judge Gregory wrote a dissenting opinion.

**ARGUED:** William David Auman, AUMAN LAW OFFICES, Asheville, North Carolina, for Appellant. Scott Andrew Lemmon, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Robert J. Higdon, Jr., United States Attorney, J. Bradford Knott, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

This appeal involves searches of two packages at a FedEx processing facility that were addressed to a deceased person. The defendant, Faruq Rose, the intended recipient of those packages, asserts a Fourth Amendment right entitling him to suppression of evidence of cocaine discovered during those searches.

Rose was convicted by a jury of (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846; and (2) possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). The district court sentenced Rose to serve a 420-month term of imprisonment and a five-year term of supervised release.

Before trial, Rose filed a motion to suppress evidence of the cocaine found in the two searches conducted at the FedEx processing facility. Rose argued that although he was neither the sender of, nor the named recipient on, the packages, he nonetheless had a reasonable expectation of privacy in those packages because he was their *intended* recipient. The district court denied Rose's motion.

On appeal, Rose challenges the district court's denial of his motion to suppress, as well as the procedural and substantive reasonableness of his sentence.[1] Upon our review, we conclude that the district court did not err in denying the suppression motion because, at the time the searches were conducted, Rose did not have a reasonable expectation of privacy in the packages. We also reject Rose's arguments regarding the procedural and

---

[1] Rose also contends that his counsel rendered ineffective assistance at his suppression hearing, an issue that we address summarily later in this opinion.

substantive reasonableness of his sentence.  Accordingly, we affirm the district court's judgment.

I.

Rose developed a scheme to receive packages containing illegal controlled substances by having them delivered to a friend's residence in North Carolina.  Rose paid his friend, Donald Ray West (West, or Donald West), to allow the packages, which were addressed to West's deceased brother, Ronald West, to be delivered to West's house in Wallace, North Carolina.  Rose did not live at West's residence.  Under the delivery arrangement with Donald West, and before delivery of the packages at issue here, Rose successfully had obtained multiple packages addressed to Ronald West that had been delivered to the residence.  The record lacks any evidence that law enforcement was aware of these prior deliveries at the time of the searches at issue.

After those completed deliveries, in October 2016, Drug Enforcement Administration Task Force Officer Kevin Cornell and Guilford County Deputy Sheriff Thomas Gordy were screening packages at the "FedEx Mid-Atlantic Hub" in Greensboro, North Carolina (the FedEx facility), and noticed a suspicious package on the conveyor belt. The package attracted Deputy Gordy's attention because of the type of box, the heavy taping used, and the sender's location in Chandler, Arizona, which was a known "source city" for narcotics.

The package was addressed to Ronald West and listed a phone number on the label. After checking a law enforcement database, the officers verified that neither the phone

number nor the address was registered to a person named Ronald West. The officers alerted the FedEx facility's manager to the suspicious package, which the manager opened. The package contained about two kilograms of cocaine.

Several minutes later, Officer Cornell spotted a second package with similar characteristics, which also was addressed to Ronald West and had been shipped from Chandler, Arizona. When the officers had a dog trained in narcotics detection approach the package, the dog signaled an "alert." Based on this alert, the officers obtained a search warrant, opened the package, and found two more kilograms of cocaine.

Following these discoveries, law enforcement officers coordinated a controlled delivery of both packages to West's residence and conducted surveillance of the home. After the packages were delivered, officers observed Rose and another man, LaVonne Murray, arrive at West's residence in a silver car and enter the home, before leaving shortly thereafter. However, while at the house, neither Rose nor Murray touched the packages that had been left on the front porch. When West later arrived at his residence, he entered but also did not touch the packages on the porch. Later that day, Rose and Murray returned to the residence, retrieved the packages, and departed in the silver car.

When officers tried to stop the vehicle, Rose, who was driving, attempted to evade them. Ultimately, the silver car collided head-on with an unmarked police car in a parking lot.

After the officers arrested Rose and informed him of his *Miranda* rights, he waived his right to remain silent. Rose explained that the packages contained cocaine, and that he

4

was working with a drug organization to smuggle cocaine from California into North Carolina.

Rose was indicted for (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 21 U.S.C. § 846; and (2) possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). He filed a motion to suppress the evidence found during the searches of the packages at the FedEx facility.

Before the hearing on the motion to suppress, Rose's counsel indicated that he intended to call Donald West as a witness. However, after a recess, counsel informed the court that he had changed his mind despite Rose's objection to the change in plans. As the hearing began, Rose's counsel informed the court that Rose wanted to have different counsel appointed, explaining that Rose viewed West as a necessary witness. The court responded by explaining that Rose's disagreement with counsel's tactical choice did not justify appointing new counsel, especially because present counsel was Rose's fifth attorney in the case.

When Rose's counsel attempted to introduce an affidavit executed by West, the court refused to admit it because West had not been called to testify as a witness. The court ultimately denied Rose's motion to suppress, concluding that Rose did not have an objectively reasonable expectation of privacy in the two packages at the time they were searched.

Before trial, Rose claimed that his counsel was ineffective at the suppression hearing in his approach to challenging the search and in his examination of the government's

5

witnesses. When Rose requested that new counsel be appointed, the court noted Rose's prior difficulties with his several attorneys and asked whether present counsel wished to remain in the case. After counsel responded that Rose refused to listen to him, the court granted Rose's request for a new attorney. However, Rose's difficulties continued with another attorney who represented Rose at trial.

After the district court conducted a jury trial, the jury convicted Rose on both charges. The United States Probation Office prepared a presentence report (PSR), in which the probation officer computed a total offense level of 42 and a criminal history category of VI, resulting in a United States Sentencing Guidelines (U.S.S.G.) range of 360 months to life imprisonment. Relevant to this appeal, Rose's offense level included a two-level enhancement under U.S.S.G. § 3B1.1(c) for being a leader or organizer of the offenses. The district court overruled Rose's objection to the enhancement, explaining that Rose managed or supervised Donald West by coordinating the deliveries of the controlled substances to Donald West's address, planning logistics, and recruiting West to participate in the scheme.

The court reviewed the factors listed in 18 U.S.C. § 3553(a) in determining Rose's sentence. The court noted that: (1) Rose had been convicted of serious offenses; (2) he had an extensive criminal history that included violent offenses; (3) he had a limited employment history; and (4) he had attempted to obstruct justice by his conduct at the suppression hearing and at the trial. As examples of Rose's obstructionist conduct, the probation officer detailed in the PSR Rose's actions convincing Donald West to sign a false affidavit and encouraging him to provide false testimony at trial. In imposing the sentence

6

of 420 months' imprisonment and a five-year term of supervised release, the court noted that if it had "in any way miscalculated the advisory guideline range," it would "impose the same sentence as an alternative variant sentence." Rose appeals from the district court's judgment.

## II.

### A.

We first consider Rose's assertion that the district court erred in denying his motion to suppress. His argument is based on the simple, but incorrect, premise that because he was the intended recipient of the two packages addressed to Ronald West, he had a reasonable expectation of privacy in those packages.

We review a district court's denial of a motion to suppress by considering "conclusions of law de novo and underlying factual findings for clear error." *United States v. Fall*, 955 F.3d 363, 369-70 (4th Cir. 2020) (citation omitted). The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. In determining whether a defendant has a valid basis for challenging a search, we must decide whether he had an individualized expectation of privacy that was "objectively reasonable." *United States v. Castellanos*, 716 F.3d 828, 832 & n.3 (4th Cir. 2013). Absent an objectively reasonable expectation of privacy in the items searched, an individual cannot claim protection under the Fourth Amendment. *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011); *see also Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The defendant bears the burden of showing a reasonable expectation of privacy in the property searched.

*United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).

In deciding whether a defendant has a reasonable expectation of privacy in property not in his possession at the time of the search, "we consider such factors as 'whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property.'"[2] *Castellanos*, 716 F.3d at 834 (quoting *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)). In other words, to establish a reasonable expectation of privacy, a defendant must identify evidence objectively establishing his ownership, possession, or control of the property at issue. *Id*.; *see also United States v. Stokes*, 829 F.3d 47, 53 (1st Cir. 2016) (noting the factors relevant to determining reasonable expectation of privacy include "ownership, possession and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case" (citation omitted)). When considering these factors, we focus on the defendant's established connection to the property at the time the search was conducted. *See United States v. Ferebee*, 957 F.3d 406, 416 (4th Cir. 2020) (recognizing that reasonable expectation of privacy is determined as of

---

[2] As the Supreme Court has explained, "[e]xpectations of privacy protected by the Fourth Amendment . . . need not be based on a common-law interest in real or personal property. . . . Still, property concepts are instructive in determining the presence or absence of the privacy interests protected by that Amendment." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (citation and quotations omitted).

the time of the search); *see also United States v. Jacobsen*, 466 U.S. 109, 115 (1984) ("The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that the invasion occurred.").

Sealed envelopes and packages generally enjoy a high degree of privacy and, thus, courts have long recognized that the Constitution protects against unreasonable searches and seizures of sealed mail. *United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984) (per curiam) (citing *Ex parte Jackson*, 96 U.S. 727, 733 (1878)). Both senders and recipients of letters and other sealed packages ordinarily have a legitimate expectation of privacy in those items even after they have been placed in the mail. *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970) (citing *Jackson*, 96 U.S. at 733); *see also Stokes*, 829 F.3d at 52.

When a sealed package is addressed to a party other than the intended recipient, however, that recipient does not have a legitimate expectation of privacy in the package absent other indicia of ownership, possession, or control existing at the time of the search. *See Givens*, 733 F.2d at 342; *see also Stokes*, 829 F.3d at 52 (noting that courts are "reluctant to find that a defendant holds a reasonable expectation of privacy in mail where he is listed as neither the sender nor the recipient, at least absent some showing by the defendant of a connection"); *United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994) (concluding that the defendant did not have a protected privacy interest in the contents of an envelope when he was not the sender or addressee); *United States v. Daniel*, 982 F.2d 146, 149 (5th Cir. 1993) (per curiam) (explaining that the defendant did not have a legitimate expectation of privacy in a box of narcotics that was not addressed to him);

*United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988) (concluding that one of the defendants had no privacy right in a package when he was neither the sender nor the addressee of the package).

Nonetheless, "[i]ndividuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." *Castellanos*, 716 F.3d at 834 (alteration in original) (quoting *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992)). In that alleged circumstance, to demonstrate a reasonable expectation of privacy, the defendant must provide evidence that the fictitious name is an established alias. *Id*.

Our decision in *Givens* applied these principles and is controlling in the present case. 733 F.2d 339. In *Givens*, the defendants, Debbie and Gary Givens, challenged the search of a package containing cocaine that was not addressed to them, but was addressed to another individual, Debbie Starks.[3] *Id*. at 340. Law enforcement officers earlier had learned that a shipment of drugs would be arriving at an airport in West Virginia and observed that a package addressed to Debbie Starks fit the description of the anticipated shipment. *Id*. Based on this information, the officers searched the package and found cocaine inside. *Id*. Before the search, but after law enforcement received the tip, the defendants attempted to retrieve the package from the airport but were told that the delivery had been delayed. *Id*. When Debbie Givens later took possession of the package, she was arrested. *Id*.

---

[3] The package was addressed to "Midwest Corporation, Union Building, Charleston, West Virginia; Att: Debbie Starkes [sic]." *Givens*, 733 F.2d at 340.

We held that the defendants did not have a reasonable expectation of privacy to challenge the search. *Id*. at 342. Even though they were the intended recipients of the package containing cocaine, we noted that the package was not addressed to them or to any established alter egos. *Id*. at 341. Critically, we explained that at the time the search was conducted, the defendants did not have the ability to control access to the package or to exclude others from taking possession of it. *Id*. at 342. Therefore, the defendants failed to present facts showing objective indicia of ownership, possession, or control of the package, foreclosing their ability to challenge the search. *See id*. at 341-42.

Like the defendants in *Givens*, Rose did not have a reasonable expectation of privacy in the packages addressed to Ronald West because, at the time of the searches, there were no objective indicia that Rose owned, possessed, or exercised control over the packages. *See Jacobsen*, 466 U.S. at 115; *Stokes*, 829 F.3d at 53. Nothing about the packages, including the sender's name, the named recipient, the address, or the phone number listed on the packages signaled in an objective sense that Rose had a protected interest in the packages. The packages were addressed to a deceased individual at a residence lacking any established connection to Rose. Moreover, at the time of the searches, Rose had not taken possession of the packages.

We disagree with Rose's contention that the Supreme Court's decision in *Byrd v. United States*, 138 S. Ct. 1518 (2018), requires a different result here. In *Byrd*, the Supreme Court concluded that a defendant had a reasonable expectation of privacy in a rented vehicle even when he was not listed as an authorized driver of the vehicle because, at the time of the search, he had lawful possession and control of the rental car. *Id*. at 1524, 1531.

11

The present facts and circumstances, however, are materially different from those in *Byrd*. Rose did not have possession of the packages at the time of the searches, and nothing in the record demonstrates that he would have been able to gain possession of the packages at the FedEx facility. *See United States v. Pitts*, 322 F.3d 449, 456-57 (7th Cir. 2003) (holding that a defendant lacking the proper identification did not have a protected interest in a mailed package bearing a false return address and a fictitious name).[4] Because the two packages bore another person's name and lacked objective indicia connecting Rose to the packages as the intended recipient, he would not have been able to exercise at the FedEx facility any ownership rights or control over the packages. *See Stokes*, 829 F.3d at 53.

Contrary to Rose's arguments, his subjective interest as the intended recipient of the packages is insufficient on its own to warrant protection under the Fourth Amendment. Instead, a party's subjective interest in a package must be accompanied by reasonable, *objective* indicia of a possessory interest. This possessory interest does not require ownership; instead, there can be other evidence establishing possession and control. *See Castellanos*, 716 F.3d at 834. Thus, we find no merit in Rose's attempt to divert from this

---

[4] In *Pitts*, the Seventh Circuit explained that the defendant did not have a reasonable expectation of privacy in a parcel after he shipped that parcel without any legitimate means of retrieving it; he used a false return address and did not have identification matching the false name included on the mailing label. 322 F.3d at 456-57. While the court concluded that Pitts did not have a reasonable expectation of privacy in the package because the property was abandoned, *id.*, the reasoning in *Pitts* nonetheless supports our conclusion that because Rose lacked any legitimate means of retrieving the package from the FedEx facility, and did not have a right of possession or control over the package, he did not have a reasonable expectation of privacy in the package.

required analysis by relying on his subjective intent to receive the packages. *See United States v. Pierce*, 959 F.2d 1297, 1303 (5th Cir. 1992) (concluding that even if the defendant claimed he was the intended recipient of a package that was not sent by or addressed to him, and was received by another person, that fact would not be enough to demonstrate a reasonable expectation of privacy). Absent any ability to exercise ownership, possession, or control of the packages at the time of the searches, Rose had no greater privacy interest in the packages than an airport bystander. Accordingly, on the facts before us, we reject Rose's effort to establish a privacy interest based solely on his intent of future possession.

Our conclusion likewise is not altered by the fact that Rose previously had collected from West's home multiple packages addressed to Ronald West using the same delivery scheme. Rose's limited use of this deceased, third party's name does not establish that Rose used "Ronald West" as an alias or was commonly known by that name.[5] *Castellanos*, 716 F.3d at 834 ("In the absence of evidence that Castenada was Castellanos' alter ego or a fictious name, the case is more closely aligned" with *Givens*, 733 F.2d at 341). The record contains no evidence that anyone recognized Rose by the name Ronald West, nor did any evidence show that Rose used the name Ronald West regularly under different circumstances. We therefore conclude that the district court did not err in denying the

---

[5] We agree with the dissent that the use of a false name on a package, standing alone, may not undermine a reasonable expectation of privacy. However, more is needed to establish a reasonable expectation of privacy in a package not bearing the defendant's name than the defendant's subjective intent to receive the package. *See Givens*, 733 F.2d at 342; *Stokes*, 829 F.3d at 52.

13

motion to suppress because Rose failed to establish an expectation of privacy in the two packages at issue.[6]

B.

We next consider Rose's challenge to the procedural reasonableness of his sentence. According to Rose, the district court erred in applying the two-level leadership enhancement under U.S.S.G. § 3B1.1(c). In considering whether a district court properly calculated a defendant's Guidelines range, including the court's application of any sentencing enhancements, we review the court's legal conclusions de novo and its factual findings for clear error. *United States v. Pena*, 952 F.3d 503, 512 (4th Cir. 2020). We also have explained that we will not vacate a sentence "based on an alleged Guidelines error if we can determine from the record that the error is harmless." *United States v. Doctor*, 958 F.3d 226, 238 (4th Cir. 2020).

We observe that Rose's Guidelines range would not have changed absent the leadership enhancement. Without that enhancement, his total offense level would have been reduced from 42 to 40. A total offense level of 40, combined with his criminal history category of VI, would have subjected Rose to the same Guidelines range of 360 months to life imprisonment considered by the district court in this case. *See* U.S.S.G. ch. 5, pt. A

---

[6] As noted above, Rose also contends that his counsel was ineffective for failing to call Donald West as a witness at the suppression hearing and for not allowing Rose to testify at that hearing. Claims of ineffective assistance of counsel will only be considered on direct appeal when the record conclusively shows that counsel was ineffective. *United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008). Only in the most unusual case will the record satisfy this requirement. Here, because the record does not establish conclusively that counsel rendered ineffective assistance, we decline to consider Rose's claim.

14

(sentencing table). Accordingly, we hold that, even if the court erred in applying the leadership enhancement, that error was harmless and Rose's sentence was procedurally reasonable. *See United States v. Kobito,* 994 F.3d 696, 704 (4th Cir. 2021); *United States v. Donadeo*, 910 F.3d 886, 904 n.7 (6th Cir. 2018) ("Any error would also have been harmless as either way [the defendant] is subject to the same guideline range" (internal quotation and citation omitted)).

C.

Next, we address Rose's argument that his sentence is not substantively reasonable. Rose contends that the district court's comments at sentencing reflect that the court did not act impartially in determining his sentence. Rose takes issue with the district court's statements that: (1) Rose will "reap the consequences of choosing to attempt to obstruct justice," an apparent reference to Rose's attempt to convince Donald West to present false testimony and Rose's instruction that West submit a false affidavit; and (2) Rose was "belliger[ent]" and repeatedly tried to delay proceedings by interrupting court hearings and by firing multiple attorneys. Rose submits that these comments demonstrated the court's bias, which affected the length of his sentence. We disagree with Rose's argument.

We generally review a sentence under a "deferential abuse-of-discretion standard." *United States v. McDonald*, 850 F.3d 640, 643 (4th Cir. 2017) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). In considering whether a sentence is substantively reasonable, we review "the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Gomez-Jimenez*, 750 F.3d 370, 383 (4th Cir. 2014) (quoting

15

*United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010)). We presume that a sentence is reasonable if it is within a properly calculated Guidelines range. *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017).

We hold that the district court's comments concerning Rose's actions and behavior do not establish that the court was biased and, thus, we conclude that the court's comments did not impact the reasonableness of Rose's sentence. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (explaining that expressions of impatience, dissatisfaction, annoyance, and even anger do not usually constitute bias). Rather than showing bias, the court's comments regarding Rose's repeated interruptions and attempts to obstruct justice were justified based on the present record. Moreover, none of the court's comments manifested an "inability to render fair judgment." *Id*. at 551.

Our review of the record also shows that the district court took care in addressing the sentencing factors under 18 U.S.C. § 3553(a). The court expressly considered the seriousness of Rose's offenses, his lengthy criminal history that included violent offenses, and his limited employment history, before concluding that a term of 420 months' imprisonment and five years of supervised release was appropriate. And, as we already have noted, Rose received a sentence within his Guidelines range. Therefore, we hold that Rose has not rebutted the presumption that his sentence is substantively reasonable. *See Vinson*, 852 F.3d at 357.

## III.

For these reasons, we affirm the district court's judgment.

16

*AFFIRMED*

GREGORY, Chief Judge, dissenting:

In *United States v. Castellanos*, 716 F.3d 828 (4th Cir. 2013), we addressed a so-called "Fourth Amendment standing" issue like the one this case presents, concerning the use of an alias in connection with an illicit shipment. The dissent cautioned that the majority misapplied the expectation of privacy inquiry. "We are all familiar with the old legal saw: 'When the facts are against you, hammer the law. When the law is against you, hammer the facts. When both are against you, hammer the table and yell like hell.'" *Id.* at 836–37 (Davis, J., dissenting) (quoting *In re Fischer*, 131 B.R. 137, 138 (E.D. Mo. 1990)). "The facts and the law cannot be ignored in this appeal. Nor can the pounding they take from the majority denude them of the power they possess." *Id.* (Davis, J., dissenting).

This case is distinct, and so it presents us with an opportunity to clarify the doctrine. Unfortunately, the law and the facts take another hammering instead. But here, too, that pounding cannot strip them of their power. Law enforcement officers opened a package that was mailed to the Defendant, Faruq Rose, under a false name. Rose had a legitimate expectation of privacy in the mailing, despite his use of an alias, and the officers violated his Fourth Amendment rights by searching it without a warrant. Because the Majority's contrary conclusions misconstrue the law and misapply the facts, I respectfully dissent.

## I.

A Fourth Amendment challenge may be raised only by those whose rights were violated by the search itself, not those who are merely affected by the introduction of unlawfully discovered evidence. *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007).

18

The person claiming Fourth Amendment protection must show they had a legitimate expectation of privacy in the invaded place or thing. *Id.* To be "legitimate," the privacy expectation must be objectively reasonable, often meaning it "flow[s] from a 'source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* (quoting *Minnesota v. Carter*, 525 U.S. 83, 89 (1998)). The defendant must prove their privacy interest by a preponderance of the evidence. *Castellanos*, 716 F.3d at 833.

There is a long-standing recognition that "[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970); *Ex parte Jackson*, 96 U.S. 727, 733 (1878)); *see also United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984) (per curiam) ("Sealed packages are, of course, entitled to Fourth Amendment protection against warrantless searches and seizures, just as any other private area."). The expectation covers senders and recipients alike. *See Givens*, 733 F.2d at 341.

In this case, as the Majority describes, police officers at a FedEx facility searched two suspicious packages destined for Rose, the first without a warrant. The evidence at the suppression hearing established the following facts. Rose was a middleman in a drug distribution conspiracy, responsible for receiving drugs from a supplier, driving them to a buyer in North Carolina, and then driving the proceeds from their sale to his higher-up in Pennsylvania. [*See* J.A. 272–75, 295]. Rose offered to pay Donald West—his long-time acquaintance, as Rose had been close friends with West's deceased brother, Ronald West—

19

for permission to use West's home address to receive packages, and West accepted. [J.A. 139–40]. As part of their deal, Rose required that West not touch the packages when they were delivered. [J.A. 140]. Rose arranged for the supplier to mail packages to Donald West's address, addressed to "Ronald West." [*Id.*]. Packages were delivered to West's house under this arrangement at least three times before the delivery that was intercepted by the police. [*Id.*] Each time, packages were delivered to West's front porch, West did not touch them, Rose retrieved them, and Rose paid West per package, either $25, $50, or a personal amount of drugs. [*Id.*]

When police intercepted the packages at issue here, Rose immediately gave a full confession after failing to evade arrest. *See* [J.A. 270–79; *see also*] J.A. 271 ("He was adamant about talking, he wanted to talk, he wanted to talk, very adamant about wanting to cooperate."). While still in the police car, Rose claimed ownership of the packages. [*Id.*] He explained that they were sent for him to receive at West's address, and belonged to him, not West. [*Id.*] A separate set of officers interviewed West, who also said that the packages belonged to Rose, and that West granted Rose permission to receive them at the address. [J.A. 210–11, 226].

In the face of this evidence, the district court concluded Rose had no legitimate privacy expectation in the searched package because it bore "no link" to Rose while in transit. J.A. 145. The Majority agrees, pronouncing: "When a sealed package is addressed to a party other than the intended recipient, . . . that recipient does not have a legitimate expectation of privacy in the package absent other indicia of ownership, possession, or control existing as of the time of the search." Maj. Op. at 8–9. And Rose could not claim

20

to "be" the phony name listed on the package because "the defendant must provide evidence that the fictitious name is an established alias." Maj. Op. at 10, 12. Finally, the Majority regarded much of the evidence as irrelevant to "the time of the search." *See* Maj. Op. at 11–12. This reasoning rides roughshod over the law and the facts. It improperly demands formal property interests, misapplies our precedents regarding aliases, and warps the evidentiary standard that governs Fourth Amendment standing.

A.

First, the Majority errs in concluding that Rose had no privacy expectation in the package because it bore no "objective indicia" of his "ownership, possession, or control." To support this conclusion, the Majority and district court rely heavily on the idea that Rose "would not have been able to retrieve the package[]" from FedEx, who held the package at the time of the search, "because he would not have been able to produce any evidence or identification to show that he was Ronald West" and "would have had no way to assert an ownership or possessory interest in the packages." J.A. 145; *see also* Maj. Op. at 11–12 ("[N]othing in the record demonstrates that he would have been able to gain possession of the packages at the FedEx facility.").

But Rose does not have to prove anything to FedEx to prove he had an expectation of privacy in the package FedEx was handling. The Supreme Court has long made clear that "a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018); *Rakas v. Illinois*, 439 U.S. 128, 144 & n.12 (1978). Rather, "property concepts" are "instructive" to identifying objectively reasonable

21

expectations of privacy. *Byrd*, 138 S. Ct. at 1526. They analogously "guide" the inquiry, serving as a proxy for widely held privacy norms. *See id.*

For example, in the context of a home search, the Fourth Amendment "does not shield only those who have *title* to the searched premises," *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968) (emphasis added); instead, its protection may reach boarders, *McDonald v. United States*, 335 U.S. 451 (1948), tenants, *Chapman v. United States*, 365 U.S. 610 (1961), co-owners or roommates, *Georgia v. Randolph*, 547 U.S. 103 (2006), and even houseguests, *Minnesota v. Olson*, 495 U.S. 91 (1990). *Byrd* provides another example: there, the Supreme Court held that the unauthorized driver of a rental car had a reasonable privacy expectation in the vehicle. 138 S. Ct. at 1527. Though the driver lacked any formal property interest, she could still exercise property-like rights over the car; for instance, she could "exclude third parties from it, such as a carjacker." *Id.* at 1528–29.

Rose did not own the package in the eyes of FedEx, but he did have at least informal ownership, control, and possession rights in the eyes of everyone else involved. The sender intended Rose to receive the package. Rose chose its destination, arranging to use West's porch. Rose took possession of the package, just as he had for the packages previously delivered under the same arrangement. Rose also forbade West from touching the packages, and West complied. Thus, property "concepts" indicate that Rose had at least informal, property-like interests in the searched object, establishing his legitimate privacy expectation. *See id.* at 1527–29 ("[One] will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.") (internal quotations omitted); *see also Castellanos*, 716 F.3d at 834 (considering "whether th[e] person *claims* an ownership or

22

possessory interest in the property, and whether he has established a right or *taken precautions* to exclude others from the property") (emphases added). By relying on his ability to prove ownership to the third party holding the searched object, the Majority effectively mandates formal property rights, which "it is by now well established" are not necessary. *See Byrd*, 138 S. Ct. at 1527.

Furthermore, Rose had a reasonable privacy expectation entirely aside from property concepts. Rose's evidence established that he was the "recipient" of the packages as pieces of mail, and a privacy interest attaches with that status. Indeed, the sender and recipient's privacy interests in mailings continue "even after they have been placed in the mail," Maj. Op. at 9. Yet the Majority reasoned that Rose did not establish this status because the packages lacked "indicia of" Rose's "ownership, possession, or control" at the time of the search. This rule improperly blends two *alternative* grounds which could give rise to a reasonable privacy expectation, muddling the doctrine. *See Gray*, 491 F.3d at 144 (considering "*either* . . . concepts of real or personal property law *or* . . . understandings that are recognized and permitted by society") (emphases added).

When we look for "indicia of ownership, possession, or control," we are applying property concepts to identify a property-like interest in the searched place or thing, which almost always means a legitimate privacy expectation follows. *See Byrd*, 138 S. Ct. at 1527–29. That inquiry is unrelated to the privacy expectation that senders and recipients of mail are entitled to, which is simply an "understanding[] that [is] recognized and permitted by society." *See Gray*, 491 F.3d at 144; *see also Jacobsen*, 466 U.S. at 114 (proclaiming, broadly and generally, that "the public at large has a legitimate expectation

23

of privacy" in the mail). The two often go hand-in-hand, surely, but rejecting Rose's status as the recipient due to insufficient evidence of property rights improperly makes a property-based interest a necessary condition. There was plenty of evidence here indicating the package was mailed to Rose, despite its address label.

The Majority's authorities contradict its conclusion. The Majority cites *United States v. Pitts*, 322 F.3d 449, 456–57 (7th Cir. 2003) for its conclusion that the inability to take possession of the packages from FedEx undermined Rose's privacy interest. Maj. Op. at 11–12. And *Pitts* did refer to the fact that the defendant needed "proper identification . . . to retrieve the package" he sent by express mail, and because he used an alias, he would not have been unable to do so. 322 F.3d at 456–57. However, *Pitts* decided—"[b]ecause [he] could not retrieve the package and [his co-defendant] refused to accept it"—that the defendant therefore lacked Fourth Amendment standing on *abandonment* grounds. *See id*. *Pitts* then specifically held that the use of an alias did *not* undermine the defendant's privacy expectation. *See id.* at 457–59 (concluding that "[the defendants] had a right to use false names in sending and receiving mail," and "the expectation of privacy for a person using an alias . . . is one that society is prepared to recognize as reasonable"). Abandonment is not at issue here, as Rose never refused acceptance of his packages; he took possession of them and claimed ownership. The Majority misapplies *Pitts'* abandonment reasoning to require property-based evidence for the mail-based privacy expectation.

Similarly, the Majority strips *United States v. Givens* of its context. There, the defendants purchased cocaine through the mail, using "an intermediary" to receive the

24

shipment and then deliver them the drugs. 733 F.2d at 340. *Givens* held that the defendants had no privacy interest in the *mailing* as the intended downstream recipients of its *contents*. *Id.* at 340–42 (rejecting "the proposition that when A sends a package to B, the contents of which are ultimately intended for C, that C is entitled to claim a privacy interest in the contents of the package"). The Majority cites *Givens* as supporting its rule: "Critically, . . . the defendants did not have the ability to control access to the package or to exclude others from taking possession of it. Therefore, the defendants failed to present facts showing objective indicia of ownership, possession, or control . . ., foreclosing their ability to challenge the search." *See* Maj. Op. at 10–11 (internal citations omitted) (citing *Givens*, 733 F.3d at 341–42).

But the property discussion in *Givens* flowed from the Court's initial conclusion that the defendants had no mail-based interest. The package was mailed to an "actual third part[y]" and that intermediary was its true "recipient." *See Givens*, 733 F.3d at 341–42. Only then did the Court also conclude, for the same reason, that the defendants had no property-type interests in the package. *See id.* (assuming that "defendants had some possessory interest in *the cocaine*," that interest "did not broaden to encompass the *mailing envelope*") (emphases added). The defendants' attempt to claim property interests in someone else's package was like claiming "privacy in the trunk of another's car." *Id.* By shipping their drugs to an intermediary, they "relinquished control over the area in which the drugs they claim an interest in were secreted." *Id.*

The difference in this case is obvious. There is no third-party intermediary here. *Castellanos*, 716 F.3d at 848 (Davis, J., dissenting) ("The distinction between the use of a

25

third party as an addressee, and the use of an alias disguising the true identity of the addressee, cannot be overstated."). Rose *was* the intended recipient of the mailing, not just its contents. "An individual who is not the sender cannot assert an expectation of privacy in a mailing addressed to an actual third party because the privacy right, and thus any Fourth Amendment challenge, belongs to that third party." *Id.* (Davis, J., dissenting) However, when "the individual asserting the expectation of privacy is in fact the addressee but has disguised his true identity by using an alias, he retains an expectation of privacy in the object, and the right to bring a Fourth Amendment challenge to the search or seizure of that object." *Id.* (Davis, J., dissenting); *see also United States v. Johnson,* 584 F.3d 995, 1002 (10th Cir. 2009) ("[T]here is a fundamental difference between merely using an alias to receive a package and using another's identity.").

The Majority glosses over this dispositive difference, applying *Givens* as "controlling in the present case." *See* Maj. Op. at 10–12. The Majority emphasizes that the *Givens* defendants' inability to "show[] objective indicia of ownership" and "exclude others from taking possession" counted against their privacy expectations. *Id.* Yet the Majority ignores that they lacked those abilities specifically because the mailing at issue was sent to someone else. Here, the evidence is unequivocal that the package was sent to Rose. Rose never "relinquished control" of the mailing to an intermediary; he controlled its delivery and excluded others from taking possession. Rose is not like a person claiming privacy in someone else's trunk—he claims privacy in his own package. Whether applying the privacy expectation in mail, like *Givens* did first, or looking to property concepts, like *Givens* did second, Rose had a legitimate expectation of privacy.

26

## B.

Furthermore, the Majority's approach is incompatible with our recognition that a false name alone does not undermine the privacy expectation in mail. *Castellanos*, 716 F.3d at 834. Presumably, almost all alias-users would be unable to claim a package directly from the mail carrier. Like the district court, the Majority adopts another rule to resolve this contradiction: "[T]he defendant must provide evidence that the fictitious name is an established alias." Maj. Op. at 10, 13 ("Rose's limited use of this deceased, third party's name does not establish that Rose used 'Ronald West' as an alias or was commonly known by that name."); *id.* ("The record contains no evidence that anyone recognized Rose by the name Ronald West, nor did any evidence show that Rose used the name Ronald West regularly under different circumstances."); *see also* J.A. J.A. 146 (reasoning that Rose had no "publicly-established connection" to the alias). There is no legal basis for this requirement. We should not be the first to adopt it here.

The Majority cites *Castellanos* for its rule. Maj. Op. at 10. *Castellanos* states, "Individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." 716 F.3d at 834 (quoting *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992)). Applying that premise, it found:

> Castellanos adduced no evidence at the suppression hearing demonstrating that the name 'Wilmer Castenada' was simply an alias. Instead, Castellanos' position was that he and Castenada were two separate individuals engaged in a sale transaction . . . . In the absence of evidence that Castenada was Castellanos' alter ego or a fictitious name, this case is more closely aligned with [*Givens*], a case in which we held that a defendant lacked a legitimate expectation of privacy in a package that was addressed to a third party.

27

*Id.* Nothing about this analysis supports a requirement that the defendant be "commonly known" by the alias, or that the alias is "established" or used "regularly." Rather, the defendant put forward "no evidence" that he was, in fact, the person behind the name. *See id.* Indeed, his position was that the name referred to an actual other person, not him. *See id.* As an evidentiary matter, the defendant had not shown that he was the "recipient" of a mailing addressed to him under an "alter ego *or* a *fictitious name*." *See id.* (emphases added). That conclusion does not relate to public recognition of the name; it requires evidence connecting the defendant to the name at all. *See id.*

For its part, the district court supported its requirement of a "publicly established" alias by citing *Villarreal*, the case *Castellanos* quoted. J.A. 146. There, the court held that two defendants had a legitimate expectation of privacy as the "intended recipients" of two drums concealing a shipment of marijuana. *Villarreal*, 963 F.2d at 772–73. The defendants used "a fictitious name [] to ship the drums so that no one could be connected to the marijuana in case anything went wrong." *Id.* Two facts related to the alias: One of the defendants "was in possession of the receipt for the drums that bore the [alias] name"; and, when that defendant hired a driver to help pick up the drums, he introduced himself by the alias. *See id.* The defendants had never used the false name before and used it only in their attempt to obtain the shipment. Nothing about these two facts makes the alias "publicly established"; arguably, the defendant used the alias less than Rose used the name "Ronald West."

Indeed, the Fifth Circuit expressly found it was "not clear whether [the alias] was the alter ego of [the defendants]." *Id.* However, the court still concluded: "In any event,

28

[the defendants] were both the immediate recipients of the drums, and they conspired together to get them from [the carrier]," so, "[u]nder these circumstances, and given the ambiguity associated with the fictitious name, we find that both [defendants] had a legitimate expectation of privacy in the drums." *Id.* at 774–75. Because the defendants were the "recipients," the court resolved uncertainty regarding the alias *in favor of* a privacy interest. *See id.* Ultimately, *Villareal* and *Castellanos* both show that the crux of this inquiry is whether the evidence shows the defendant was the actual, intended "recipient."

Our relevant cases comport with this understanding. In *United States v. Hurley*, when officers discovered methamphetamine in a package addressed to a fictitious name, we stated that "the sender and the *designated recipient* of a package" have a reasonable privacy expectation. 182 F. App'x 142, 143–45 (4th Cir. 2006) (per curiam) (emphasis added). *Hurley* held the defendant failed to establish that he was the recipient because: he had never used the false name on the shipping label before; he used the false name on a call to FedEx, but declined to pick it up because he lacked corresponding I.D.; he included a friend's phone number on the shipping label, not his own; and he did not live at the listed address and did not know who did. *Id.* at 144–45. Prior usage and the inability to prove a connection to the alias were relevant, but not dispositive. *See id.* Instead, as an evidentiary matter, the defendant failed to establish that he was the "designated recipient." *See id.* ("Hurley has standing to contest the validity of the search only if he can demonstrate that he was the designated recipient of the package. This he cannot do.").

Finally, in *Givens*, addressed above, the defendants were the intended recipients of the contents of a package, but not of the package itself. The Court commented on the role

29

of fake names: "[I]t is no doubt true that, had this package been addressed to the defendants, they would have had a legitimate expectation of privacy in its contents"; however, "the package [was] addressed neither to them *nor to some entity, real or fictitious, which is their alter ego,* but to *actual* third parties." 733 F.2d at 341 & n.2 (emphases added). Thus, we acknowledged that the privacy interest would attach if the defendants could prove they *were* the intended recipients of the mailing itself, merely using a fictitious name. *See id.*

None of these cases required proof of an "established connection" to the alias. All of them, however, support the conclusion that Rose showed he was the "recipient" behind the fake name. The *Castellanos* defendant denied property interests, had no connection to the address, and maintained from arrest through trial that the alias was another person. *Id.* By contrast, Rose took possession of the packages, claimed his ownership, and claimed to use the name "Ronald West." Likewise, while the *Hurley* defendant had not used the false name before, 182 F. App'x at 144, Rose had used this one at least three times. Like in this case, the phone number on the package did not belong to the defendant, but unlike in this case, it *did* belong to the defendant's friend, creating competing evidence about who the "recipient" of the package really was. *See id.* at 145. Here, while the address label was ambiguous, the rest of the evidence points only to Rose. Most significantly, the *Hurley* defendant did not know the people living at the listed address and had no permission to receive packages there, whereas Rose had permission and the resident knew the packages were arriving for Rose. *See id.* Rose established the package *was* addressed to him under some fictitious name, not to "actual third parties." *Givens*, 733 F.2d at 341 & n.2.

30

Beyond this absence of legal authority, the Majority's rule has perverse effects. By protecting only formal pseudonyms—aliases so "established" that the user is "recognized" by it or uses it "regularly"—the rule undermines Fourth Amendment protection as to virtually every purpose for which a person might use an alias on their mail. *See Pitts*, 322 F.3d at 458 ("This is a common and unremarkable practice."). Those purposes are reasonable and encompassed within societally recognized privacy expectations. *See id.* ("There is nothing inherently wrong with a desire to remain anonymous when sending or receiving a package, and thus the expectation of privacy for a person using an alias in sending or receiving mail is one that society is prepared to recognize as reasonable.").

Imagine the celebrity avoiding paparazzi; the federal judge facing heightened security risks; the internet-user ordering from strangers; the shopper of sensitive products avoiding prying eyes. In each instance, the alias-user reasonably intends to send or receive their mail without revealing identifying information. To accomplish this, all would use informal aliases that specifically do *not* bear a public connection to their real identity. The same is true of receiving mail at an address aside from one's own residence. Imagine the family member concealing their reception of a package from those they live with—even for a banal reason, like planning a surprise gift—or the city-dweller facing the prevalent problem of "porch theft." If they ship a package to their next-door neighbor's house instead of their own, with permission, they can reasonably expect that it still belongs to them. If police searched the package, the actual recipient should have standing to challenge the search, not the friend who lent their stoop. Ironically, under the Majority's rule, the

alias-user's efforts to protect their identity may end up relinquishing their privacy interests in their mail altogether.

I recognize that, here, Rose used both a false name and someone else's address for a distinct purpose: to evade responsibility for drug trafficking. But we do not allow "criminals [to] forfeit the privacy interests of all persons by using a confidential domain for nefarious ends," nor do we allow "[t]he illegal contents of the package [to] serve as an after-the-fact justification for a search." *Pitts*, 322 F.3d at 458–59. "Privacy expectations do not hinge on the nature of the defendant's activities—innocent or criminal." *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997). Often, we only have occasion to identify privacy norms "precisely because the defendants were engaged in illegal activity." *Id.* Disregarding Rose's reasonable privacy expectation because of his unlawful intentions undermines the privacy of many law-abiding citizens.

C.

Finally, the Majority reaches its conclusions by disregarding the most probative evidence as irrelevant to "the time of the searches." *See* Maj. Op. at 11–12 ("Absent any ability to exercise ownership, possession, or control of the packages *at the time of the searches*, Rose had no greater privacy interest in the packages than an airport bystander.") (emphasis added); Maj. Op. at 3 ("The record lacks any evidence that law enforcement was aware of the[] prior deliveries at the time of the searches at issue."); J.A. 147 ("Rose cites statements that he made to law enforcement after law enforcement apprehended him, [but] . . . [t]he relevant inquiry is whether Rose had any claimed ownership or possessory interest . . . at the time of the search."). By this view, the fact that Rose could not have claimed the

32

package from the FedEx facility is effectively dispositive because *that* is when the search took place. "Nothing about the packages . . . signaled in an objective sense that Rose had a protected interest in the packages" at *that* time. Maj. Op. at 11.

This reasoning is simply contrary to Fourth Amendment standing doctrine. "Fourth Amendment reasonableness is of course adjudged at the time of the search or seizure." *United States v. Montieth*, 662 F.3d 660, 668 (4th Cir. 2011). But, as to standing, this principle only means that we consider whether the defendant's privacy interest existed at the relevant time. It certainly does not mean that, at the search, the evidence of those interests must have been apparent to the searchers. *See* 6 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 11.3 (6th ed. 2020) ("In determining Fourth Amendment standing, as opposed to reasonableness [of a search], we do not consider what the police officer knew at the time . . . ."). As a matter of hornbook law, "[i]t is instead the omniscient perspective—what a judge considering a motion to suppress knows, ex post reality—that drives standing doctrine." *Id.* (internal quotations omitted).

"[The] state of mind of the searcher regarding the possession or ownership of the item searched is irrelevant to the issue of standing." *United States v. Han*, 74 F.3d 537, 535 (4th Cir. 1996) (quoting *United States v. Canada*, 527 F.2d 1374, 1378 (9th Cir. 1975)). Thus, "the question is *not* (as is so often the case regarding other Fourth Amendment doctrine) how the police should have reasonably perceived the situation at the time of the search or seizure." LaFave, *supra*, § 11.3 ("The police officer's perspective does not matter at all for these purposes."). That means, here, it is irrelevant that nothing at the FedEx facility "signaled" Rose's interests in the package. And it is irrelevant that

33

the police could not have known of all the other evidence supporting this conclusion. What matters is that *we* know these facts now, and they are probative of Rose's interests at the relevant time. Similarly, it is immaterial that this probative evidence came to light only after the search: Rose taking possession and claiming ownership of the packages is not a mark of when his privacy interests *began*; it indicates he had those interests *all along*.

If all alias-users had to have the "ability to exercise ownership, possession, or control of the package[]" at the very moment of the search, they could never challenge a mid-transit search. The legitimate expectation of privacy is not so fickle as to dissipate just because the searched object is temporarily outside the defendant's reach and the searchers are unaware who the owner or recipient is. *See, e.g.*, *Castellanos*, 716 F.3d at 833–34 (considering evidence, in general, of the defendant's property-type interests in the car, despite the false name on the shipment, to determine whether he "ha[d] a reasonable expectation of privacy in property that is held by another").

Applying this objective analysis, considering all facts now known about the searched package, it is undeniable that Rose was its recipient. The alias would only be a barrier to that conclusion absent evidence establishing who the alias identified. Here, that evidence is plentiful. And that status existed at the time of the search. *Cf.* Maj. Op. at 9 (explaining that privacy expectation in mailing persists "even after [it] ha[s] been placed in the mail"). The resulting privacy interest did not depend on its visibility. Therefore, Rose's reasonable expectation of privacy was violated when the package was searched without a warrant, even if no one there at the time knew it.

The officers at the FedEx facility had a drug-sniffing dog waiting outside in the parking lot. After they opened one of Rose's packages without a warrant, they followed proper procedure as to a second: they set up a "lineup" of packages, the dog identified the suspected package, they took the package away unopened, and they successfully obtained a warrant before searching it. Their unexplained failure to follow this process initially is exactly the kind of misconduct the Fourth Amendment enforcement framework deters. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) ("[The exclusionary rule's] purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.").

Rose held the violated privacy interests that give rise to the right to set this deterrent mechanism into action. However, the Majority regards Rose's attempts to obscure his identity on the outside of his packages as undermining those interests, despite all the evidence we have making clear Rose was, indeed, their recipient. As a result, *no one* holds the privacy interest necessary for raising a potential constitutional violation, depriving all of us of the Fourth Amendment's protections. *See id.* ("The rule is calculated to prevent, not to repair."); *United States v. Calandra*, 414 U.S. 338, 347 (1974) ("[T]he rule is . . . designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.").

"At bottom, as a matter of law, Appellant did not relinquish, and society is not prepared to extinguish, the objective reasonableness of his undisputed subjective expectation of privacy simply because he used an alias." *See Castellanos*, 716 F.3d at 837

(Davis, J., dissenting). The Majority's approach defies the available evidence and muddles the standing doctrine. For the foregoing reasons, I would hold that Rose had the necessary privacy expectation in the searched object to move to suppress the discovered evidence, vacating the judgment and remanding to the district court.